TINKER ET AL. *v.* DES MOINES INDEPENDENT
COMMUNITY SCHOOL DISTRICT ET AL.

No. 21.   Argued November 12, 1968.—Decided February 24, 1969.

*Dan L. Johnston* argued the cause for petitioners. With him on the brief were *Melvin L. Wulf* and *David N. Ellenhorn.*

*Allan A. Herrick* argued the cause for respondents. With him on the brief were *Herschel G. Langdon* and *David W. Belin.*

*Charles Morgan, Jr.,* filed a brief for the United States National Student Association, as *amicus curiae,* urging reversal.

Mr. Justice Fortas delivered the opinion of the Court.

Petitioner John F. Tinker, 15 years old, and petitioner Christopher Eckhardt, 16 years old, attended high schools in Des Moines, Iowa. Petitioner Mary Beth Tinker, John's sister, was a 13-year-old student in junior high school.

In December 1965, a group of adults and students in Des Moines held a meeting at the Eckhardt home. The group determined to publicize their objections to the hostilities in Vietnam and their support for a truce by wearing black armbands during the holiday season and by fasting on December 16 and New Year's Eve. Petitioners and their parents had previously engaged in similar activities, and they decided to participate in the program.

The principals of the Des Moines schools became aware of the plan to wear armbands. On December 14, 1965, they met and adopted a policy that any student wearing an armband to school would be asked to remove it, and if he refused he would be suspended until he returned without the armband. Petitioners were aware of the regulation that the school authorities adopted.

On December 16, Mary Beth and Christopher wore black armbands to their schools. John Tinker wore his armband the next day. They were all sent home and suspended from school until they would come back without their armbands. They did not return to school until after the planned period for wearing armbands had expired—that is, until after New Year's Day.

This complaint was filed in the United States District Court by petitioners, through their fathers, under § 1983 of Title 42 of the United States Code. It prayed for an injunction restraining the respondent school officials and the respondent members of the board of directors of the school district from disciplining the petitioners, and it sought nominal damages. After an evidentiary hearing the District Court dismissed the complaint. It up-

held the constitutionality of the school authorities' action on the ground that it was reasonable in order to prevent disturbance of school discipline. 258 F. Supp. 971 (1966). The court referred to but expressly declined to follow the Fifth Circuit's holding in a similar case that the wearing of symbols like the armbands cannot be prohibited unless it "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school." *Burnside* v. *Byars,* 363 F. 2d 744, 749 (1966).[1]

On appeal, the Court of Appeals for the Eighth Circuit considered the case *en banc.* The court was equally divided, and the District Court's decision was accordingly affirmed, without opinion. 383 F. 2d 988 (1967). We granted certiorari. 390 U. S. 942 (1968).

## I.

The District Court recognized that the wearing of an armband for the purpose of expressing certain views is the type of symbolic act that is within the Free Speech Clause of the First Amendment. See *West Virginia* v. *Barnette,* 319 U. S. 624 (1943); *Stromberg* v. *California,* 283 U. S. 359 (1931). Cf. *Thornhill* v. *Alabama,* 310 U. S. 88 (1940); *Edwards* v. *South Carolina,* 372 U. S. 229 (1963); *Brown* v. *Louisiana,* 383 U. S. 131 (1966). As we shall discuss, the wearing of armbands in the circumstances of this case was entirely divorced from actually or potentially disruptive conduct by those participating in it. It was closely akin to "pure speech"

---

[1] In *Burnside,* the Fifth Circuit ordered that high school authorities be enjoined from enforcing a regulation forbidding students to wear "freedom buttons." It is instructive that in *Blackwell* v. *Issaquena County Board of Education,* 363 F. 2d 749 (1966), the same panel on the same day reached the opposite result on different facts. It declined to enjoin enforcement of such a regulation in another high school where the students wearing freedom buttons harassed students who did not wear them and created much disturbance.

which, we have repeatedly held, is entitled to comprehensive protection under the First Amendment. Cf. *Cox* v. *Louisiana,* 379 U. S. 536, 555 (1965); *Adderley* v. *Florida,* 385 U. S. 39 (1966).

First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years. In *Meyer* v. *Nebraska,* 262 U. S. 390 (1923), and *Bartels* v. *Iowa,* 262 U. S. 404 (1923), this Court, in opinions by Mr. Justice McReynolds, held that the Due Process Clause of the Fourteenth Amendment prevents States from forbidding the teaching of a foreign language to young students. Statutes to this effect, the Court held, unconstitutionally interfere with the liberty of teacher, student, and parent.[2] See also *Pierce* v. *Society of Sisters,* 268

---

[2] *Hamilton* v. *Regents of Univ. of Cal.,* 293 U. S. 245 (1934), is sometimes cited for the broad proposition that the State may attach conditions to attendance at a state university that require individuals to violate their religious convictions. The case involved dismissal of members of a religious denomination from a land grant college for refusal to participate in military training. Narrowly viewed, the case turns upon the Court's conclusion that merely requiring a student to participate in school training in military "science" could not conflict with his constitutionally protected freedom of conscience. The decision cannot be taken as establishing that the State may impose and enforce any conditions that it chooses upon attendance at public institutions of learning, however violative they may be of fundamental constitutional guarantees. See, *e. g., West Virginia* v. *Barnette,* 319 U. S. 624 (1943); *Dixon* v. *Alabama State Board of Education,* 294 F. 2d 150 (C. A. 5th Cir. 1961); *Knight* v. *State Board of Education,* 200 F. Supp. 174 (D. C. M. D. Tenn. 1961); *Dickey* v. *Alabama State Board of Education,* 273 F. Supp. 613 (D. C. M. D. Ala. 1967). See also Note, Unconstitutional Conditions, 73 Harv. L. Rev. 1595 (1960); Note, Academic Freedom, 81 Harv. L. Rev. 1045 (1968).

U. S. 510 (1925); *West Virginia* v. *Barnette,* 319 U. S. 624 (1943); *McCollum* v. *Board of Education,* 333 U. S. 203 (1948); *Wieman* v. *Updegraff,* 344 U. S. 183, 195 (1952) (concurring opinion); *Sweezy* v. *New Hampshire,* 354 U. S. 234 (1957); *Shelton* v. *Tucker,* 364 U. S. 479, 487 (1960); *Engel* v. *Vitale,* 370 U. S. 421 (1962); *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603 (1967); *Epperson* v. *Arkansas, ante,* p. 97 (1968).

In *West Virginia* v. *Barnette, supra,* this Court held that under the First Amendment, the student in public school may not be compelled to salute the flag. Speaking through Mr. Justice Jackson, the Court said:

> "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." 319 U. S., at 637.

On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. See *Epperson* v. *Arkansas, supra,* at 104; *Meyer* v. *Nebraska, supra,* at 402. Our problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities.

## II.

The problem posed by the present case does not relate to regulation of the length of skirts or the type of cloth-

ing, to hair style, or deportment. Cf. *Ferrell* v. *Dallas Independent School District*, 392 F. 2d 697 (1968); *Pugsley* v. *Sellmeyer*, 158 Ark. 247, 250 S. W. 538 (1923). It does not concern aggressive, disruptive action or even group demonstrations. Our problem involves direct, primary First Amendment rights akin to "pure speech."

The school officials banned and sought to punish petitioners for a silent, passive expression of opinion, unaccompanied by any disorder or disturbance on the part of petitioners. There is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone. Accordingly, this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students.

Only a few of the 18,000 students in the school system wore the black armbands. Only five students were suspended for wearing them. There is no indication that the work of the schools or any class was disrupted. Outside the classrooms, a few students made hostile remarks to the children wearing armbands, but there were no threats or acts of violence on school premises.

The District Court concluded that the action of the school authorities was reasonable because it was based upon their fear of a disturbance from the wearing of the armbands. But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello* v. *Chicago*, 337 U. S. 1 (1949); and our history says that it is this sort of hazardous freedom—this kind of openness—that is

the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained. *Burnside* v. *Byars, supra,* at 749.

In the present case, the District Court made no such finding, and our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students. Even an official memorandum prepared after the suspension that listed the reasons for the ban on wearing the armbands made no reference to the anticipation of such disruption.[3]

---

[3] The only suggestions of fear of disorder in the report are these:

"A former student of one of our high schools was killed in Viet Nam. Some of his friends are still in school and it was felt that if any kind of a demonstration existed, it might evolve into something which would be difficult to control."

"Students at one of the high schools were heard to say they would wear arm bands of other colors if the black bands prevailed."

Moreover, the testimony of school authorities at trial indicates that it was not fear of disruption that motivated the regulation prohibiting the armbands; the regulation was directed against "the principle of the demonstration" itself. School authorities simply felt that "the schools are no place for demonstrations," and if the students "didn't like the way our elected officials were handling things, it should be handled with the ballot box and not in the halls of our public schools."

On the contrary, the action of the school authorities appears to have been based upon an urgent wish to avoid the controversy which might result from the expression, even by the silent symbol of armbands, of opposition to this Nation's part in the conflagration in Vietnam.[4]  It is revealing, in this respect, that the meeting at which the school principals decided to issue the contested regulation was called in response to a student's statement to the journalism teacher in one of the schools that he wanted to write an article on Vietnam and have it published in the school paper.  (The student was dissuaded.[5])

It is also relevant that the school authorities did not purport to prohibit the wearing of all symbols of political or controversial significance.  The record shows that students in some of the schools wore buttons relating to national political campaigns, and some even wore the Iron Cross, traditionally a symbol of Nazism.  The order prohibiting the wearing of armbands did not extend to these.  Instead, a particular symbol—black armbands worn to exhibit opposition to this Nation's involvement

---

[4] The District Court found that the school authorities, in prohibiting black armbands, were influenced by the fact that "[t]he Viet Nam war and the involvement of the United States therein has been the subject of a major controversy for some time.  When the arm band regulation involved herein was promulgated, debate over the Viet Nam war had become vehement in many localities.  A protest march against the war had been recently held in Washington, D. C.  A wave of draft card burning incidents protesting the war had swept the country.  At that time two highly publicized draft card burning cases were pending in this Court.  Both individuals supporting the war and those opposing it were quite vocal in expressing their views."  258 F. Supp., at 972–973.

[5] After the principals' meeting, the director of secondary education and the principal of the high school informed the student that the principals were opposed to publication of his article.  They reported that "we felt that it was a very friendly conversation, although we did not feel that we had convinced the student that our decision was a just one."

in Vietnam—was singled out for prohibition. Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible.

In our system, state-operated schools may not be enclaves of totalitarianism. School officials do not possess absolute authority over their students. Students in school as well as out of school are "persons" under our Constitution. They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State. In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views. As Judge Gewin, speaking for the Fifth Circuit, said, school officials cannot suppress "expressions of feelings with which they do not wish to contend." *Burnside* v. *Byars, supra,* at 749.

In *Meyer* v. *Nebraska, supra,* at 402, Mr. Justice McReynolds expressed this Nation's repudiation of the principle that a State might so conduct its schools as to "foster a homogeneous people." He said:

> "In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius, their ideas touching the relation between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any legislature could impose such restrictions upon the people of a

State without doing violence to both letter and spirit of the Constitution."

This principle has been repeated by this Court on numerous occasions during the intervening years. In *Keyishian* v. *Board of Regents,* 385 U. S. 589, 603, MR. JUSTICE BRENNAN, speaking for the Court, said:

" 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' *Shelton* v. *Tucker,* [364 U. S. 479,] at 487. The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.' "

The principle of these cases is not confined to the supervised and ordained discussion which takes place in the classroom. The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students.[6] This is not only an inevitable part of the process of attending school; it is also an important part of the educational process. A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on

---

[6] In *Hammond* v. *South Carolina State College,* 272 F. Supp. 947 (D. C. S. C. 1967), District Judge Hemphill had before him a case involving a meeting on campus of 300 students to express their views on school practices. He pointed out that a school is not like a hospital or a jail enclosure. Cf. *Cox* v. *Louisiana,* 379 U. S. 536 (1965); *Adderley* v. *Florida,* 385 U. S. 39 (1966). It is a public place, and its dedication to specific uses does not imply that the constitutional rights of persons entitled to be there are to be gauged as if the premises were purely private property. Cf. *Edwards* v. *South Carolina,* 372 U. S. 229 (1963); *Brown* v. *Louisiana,* 383 U. S. 131 (1966).

the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others. *Burnside* v. *Byars, supra,* at 749. But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. Cf. *Blackwell* v. *Issaquena County Board of Education,* 363 F. 2d 749 (C. A. 5th Cir. 1966).

Under our Constitution, free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact. Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots. The Constitution says that Congress (and the States) may not abridge the right to free speech. This provision means what it says. We properly read it to permit reasonable regulation of speech-connected activities in carefully restricted circumstances. But we do not confine the permissible exercise of First Amendment rights to a telephone booth or the four corners of a pamphlet, or to supervised and ordained discussion in a school classroom.

If a regulation were adopted by school officials forbidding discussion of the Vietnam conflict, or the expression by any student of opposition to it anywhere on school property except as part of a prescribed classroom exercise, it would be obvious that the regulation would violate the constitutional rights of students, at least if it could not be justified by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school. Cf. *Ham-*

*mond* v. *South Carolina State College*, 272 F. Supp. 947 (D. C. S. C. 1967) (orderly protest meeting on state college campus); *Dickey* v. *Alabama State Board of Education*, 273 F. Supp. 613 (D. C. M. D. Ala. 1967) (expulsion of student editor of college newspaper). In the circumstances of the present case, the prohibition of the silent, passive "witness of the armbands," as one of the children called it, is no less offensive to the Constitution's guarantees.

As we have discussed, the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred. These petitioners merely went about their ordained rounds in school. Their deviation consisted only in wearing on their sleeve a band of black cloth, not more than two inches wide. They wore it to exhibit their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them. They neither interrupted school activities nor sought to intrude in the school affairs or the lives of others. They caused discussion outside of the classrooms, but no interference with work and no disorder. In the circumstances, our Constitution does not permit officials of the State to deny their form of expression.

We express no opinion as to the form of relief which should be granted, this being a matter for the lower courts to determine. We reverse and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEWART, concurring.

Although I agree with much of what is said in the Court's opinion, and with its judgment in this case, I

cannot share the Court's uncritical assumption that, school discipline aside, the First Amendment rights of children are co-extensive with those of adults. Indeed, I had thought the Court decided otherwise just last Term in *Ginsberg* v. *New York,* 390 U. S. 629. I continue to hold the view I expressed in that case: "[A] State may permissibly determine that, at least in some precisely delineated areas, a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Id.,* at 649–650 (concurring in result). Cf. *Prince* v. *Massachusetts,* 321 U. S. 158.

MR. JUSTICE WHITE, concurring.

While I join the Court's opinion, I deem it appropriate to note, first, that the Court continues to recognize a distinction between communicating by words and communicating by acts or conduct which sufficiently impinges on some valid state interest; and, second, that I do not subscribe to everything the Court of Appeals said about free speech in its opinion in *Burnside* v. *Byars,* 363 F. 2d 744, 748 (C. A. 5th Cir. 1966), a case relied upon by the Court in the matter now before us.

MR. JUSTICE BLACK, dissenting.

The Court's holding in this case ushers in what I deem to be an entirely new era in which the power to control pupils by the elected "officials of state supported public schools . . ." in the United States is in ultimate effect transferred to the Supreme Court.[1] The Court brought

---

[1] The petition for certiorari here presented this single question:
"Whether the First and Fourteenth Amendments permit officials of state supported public schools to prohibit students from wearing symbols of political views within school premises where the symbols are not disruptive of school discipline or decorum."

this particular case here on a petition for certiorari urging that the First and Fourteenth Amendments protect the right of school pupils to express their political views all the way "from kindergarten through high school." Here the constitutional right to "political expression" asserted was a right to wear black armbands during school hours and at classes in order to demonstrate to the other students that the petitioners were mourning because of the death of United States soldiers in Vietnam and to protest that war which they were against. Ordered to refrain from wearing the armbands in school by the elected school officials and the teachers vested with state authority to do so, apparently only seven out of the school system's 18,000 pupils deliberately refused to obey the order. One defying pupil was Paul Tinker, 8 years old, who was in the second grade; another, Hope Tinker, was 11 years old and in the fifth grade; a third member of the Tinker family was 13, in the eighth grade; and a fourth member of the same family was John Tinker, 15 years old, an 11th grade high school pupil. Their father, a Methodist minister without a church, is paid a salary by the American Friends Service Committee. Another student who defied the school order and insisted on wearing an armband in school was Christopher Eckhardt, an 11th grade pupil and a petitioner in this case. His mother is an official in the Women's International League for Peace and Freedom.

As I read the Court's opinion it relies upon the following grounds for holding unconstitutional the judgment of the Des Moines school officials and the two courts below. First, the Court concludes that the wearing of armbands is "symbolic speech" which is "akin to 'pure speech'" and therefore protected by the First and Fourteenth Amendments. Secondly, the Court decides that the public schools are an appropriate place to exercise "symbolic speech" as long as normal school func-

tions are not "unreasonably" disrupted. Finally, the Court arrogates to itself, rather than to the State's elected officials charged with running the schools, the decision as to which school disciplinary regulations are "reasonable."

Assuming that the Court is correct in holding that the conduct of wearing armbands for the purpose of conveying political ideas is protected by the First Amendment, cf., e. g., Giboney v. Empire Storage & Ice Co., 336 U. S. 490 (1949), the crucial remaining questions are whether students and teachers may use the schools at their whim as a platform for the exercise of free speech—"symbolic" or "pure"—and whether the courts will allocate to themselves the function of deciding how the pupils' school day will be spent. While I have always believed that under the First and Fourteenth Amendments neither the State nor the Federal Government has any authority to regulate or censor the content of speech, I have never believed that any person has a right to give speeches or engage in demonstrations where he pleases and when he pleases. This Court has already rejected such a notion. In Cox v. Louisiana, 379 U. S. 536, 554 (1965), for example, the Court clearly stated that the rights of free speech and assembly "do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time."

While the record does not show that any of these armband students shouted, used profane language, or were violent in any manner, detailed testimony by some of them shows their armbands caused comments, warnings by other students, the poking of fun at them, and a warning by an older football player that other, nonprotesting students had better let them alone. There is also evidence that a teacher of mathematics had his lesson period practically "wrecked" chiefly by disputes with Mary Beth Tinker, who wore her armband for her "demonstra-

518

tion." Even a casual reading of the record shows that this armband did divert students' minds from their regular lessons, and that talk, comments, etc., made John Tinker "self-conscious" in attending school with his armband. While the absence of obscene remarks or boisterous and loud disorder perhaps justifies the Court's statement that the few armband students did not actually "disrupt" the classwork, I think the record overwhelmingly shows that the armbands did exactly what the elected school officials and principals foresaw they would, that is, took the students' minds off their classwork and diverted them to thoughts about the highly emotional subject of the Vietnam war. And I repeat that if the time has come when pupils of state-supported schools, kindergartens, grammar schools, or high schools, can defy and flout orders of school officials to keep their minds on their own schoolwork, it is the beginning of a new revolutionary era of permissiveness in this country fostered by the judiciary. The next logical step, it appears to me, would be to hold unconstitutional laws that bar pupils under 21 or 18 from voting, or from being elected members of the boards of education.[2]

The United States District Court refused to hold that the state school order violated the First and Fourteenth Amendments. 258 F. Supp. 971. Holding that the protest was akin to speech, which is protected by the First

---

[2] The following Associated Press article appeared in the Washington Evening Star, January 11, 1969, p. A–2, col. 1:

"BELLINGHAM, Mass. (AP)—Todd R. Hennessy, 16, has filed nominating papers to run for town park commissioner in the March election.

" 'I can see nothing illegal in the youth's seeking the elective office,' said Lee Ambler, the town counsel. 'But I can't overlook the possibility that if he is elected any legal contract entered into by the park commissioner would be void because he is a juvenile.'

"Todd is a junior in Mount St. Charles Academy, where he has a top scholastic record."

and Fourteenth Amendments, that court held that the school order was "reasonable" and hence constitutional. There was at one time a line of cases holding "reasonableness" as the court saw it to be the test of a "due process" violation. Two cases upon which the Court today heavily relies for striking down this school order used this test of reasonableness, *Meyer* v. *Nebraska,* 262 U. S. 390 (1923), and *Bartels* v. *Iowa,* 262 U. S. 404 (1923). The opinions in both cases were written by Mr. Justice McReynolds; Mr. Justice Holmes, who opposed this reasonableness test, dissented from the holdings as did Mr. Justice Sutherland. This constitutional test of reasonableness prevailed in this Court for a season. It was this test that brought on President Franklin Roosevelt's well-known Court fight. His proposed legislation did not pass, but the fight left the "reasonableness" constitutional test dead on the battlefield, so much so that this Court in *Ferguson* v. *Skrupa,* 372 U. S. 726, 729, 730, after a thorough review of the old cases, was able to conclude in 1963:

> "There was a time when the Due Process Clause was used by this Court to strike down laws which were thought unreasonable, that is, unwise or incompatible with some particular economic or social philosophy.
>
> .    .    .    .    .
>
> "The doctrine that prevailed in *Lochner, Coppage, Adkins, Burns,* and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded."

The *Ferguson* case totally repudiated the old reasonableness-due process test, the doctrine that judges have the power to hold laws unconstitutional upon the belief of judges that they "shock the conscience" or that they are

"unreasonable," "arbitrary," "irrational," "contrary to fundamental 'decency,' " or some other such flexible term without precise boundaries. I have many times expressed my opposition to that concept on the ground that it gives judges power to strike down any law they do not like. If the majority of the Court today, by agreeing to the opinion of my Brother FORTAS, is resurrecting that old reasonableness-due process test, I think the constitutional change should be plainly, unequivocally, and forthrightly stated for the benefit of the bench and bar. It will be a sad day for the country, I believe, when the present-day Court returns to the McReynolds due process concept. Other cases cited by the Court do not, as implied, follow the McReynolds reasonableness doctrine. *West Virginia* v. *Barnette,* 319 U. S. 624, clearly rejecting the "reasonableness" test, held that the Fourteenth Amendment made the First applicable to the States, and that the two forbade a State to *compel* little schoolchildren to salute the United States flag when they had religious scruples against doing so.[3] Neither *Thornhill* v. *Alabama,* 310 U. S. 88; *Stromberg* v. *California,* 283 U. S. 359; *Edwards*

---

[3] In *Cantwell* v. *Connecticut,* 310 U. S. 296, 303–304 (1940), this Court said:

"The First Amendment declares that Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof. The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws. The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society."

v. *South Carolina,* 372 U. S. 229; nor *Brown* v. *Louisiana,* 383 U. S. 131, related to schoolchildren at all, and none of these cases embraced Mr. Justice McReynolds' reasonableness test; and *Thornhill, Edwards,* and *Brown* relied on the vagueness of state statutes under scrutiny to hold them unconstitutional. *Cox* v. *Louisiana,* 379 U. S. 536, 555, and *Adderley* v. *Florida,* 385 U. S. 39, cited by the Court as a "compare," indicating, I suppose, that these two cases are no longer the law, were not rested to the slightest extent on the *Meyer* and *Bartels* "reasonableness-due process-McReynolds" constitutional test.

I deny, therefore, that it has been the "unmistakable holding of this Court for almost 50 years" that "students" and "teachers" take with them into the "schoolhouse gate" constitutional rights to "freedom of speech or expression." Even *Meyer* did not hold that. It makes no reference to "symbolic speech" at all; what it did was to strike down as "unreasonable" and therefore unconstitutional a Nebraska law barring the teaching of the German language before the children reached the eighth grade. One can well agree with Mr. Justice Holmes and Mr. Justice Sutherland, as I do, that such a law was no more unreasonable than it would be to bar the teaching of Latin and Greek to pupils who have not reached the eighth grade. In fact, I think the majority's reason for invalidating the Nebraska law was that it did not like it or in legal jargon that it "shocked the Court's conscience," "offended its sense of justice," or was "contrary to fundamental concepts of the English-speaking world," as the Court has sometimes said. See, *e. g., Rochin* v. *California,* 342 U. S. 165, and *Irvine* v. *California,* 347 U. S. 128. The truth is that a teacher of kindergarten, grammar school, or high school pupils no more carries into a school with him a complete right to freedom of speech and expression than an anti-Catholic or anti-Semite carries with him a complete freedom of

speech and religion into a Catholic church or Jewish synagogue. Nor does a person carry with him into the United States Senate or House, or into the Supreme Court, or any other court, a complete constitutional right to go into those places contrary to their rules and speak his mind on any subject he pleases. It is a myth to say that any person has a constitutional right to say what he pleases, where he pleases, and when he pleases. Our Court has decided precisely the opposite. See, *e. g.*, *Cox* v. *Louisiana,* 379 U. S. 536, 555; *Adderley* v. *Florida,* 385 U. S. 39.

In my view, teachers in state-controlled public schools are hired to teach there. Although Mr. Justice McReynolds may have intimated to the contrary in *Meyer* v. *Nebraska, supra,* certainly a teacher is not paid to go into school and teach subjects the State does not hire him to teach as a part of its selected curriculum. Nor are public school students sent to the schools at public expense to broadcast political or any other views to educate and inform the public. The original idea of schools, which I do not believe is yet abandoned as worthless or out of date, was that children had not yet reached the point of experience and wisdom which enabled them to teach all of their elders. It may be that the Nation has outworn the old-fashioned slogan that "children are to be seen not heard," but one may, I hope, be permitted to harbor the thought that taxpayers send children to school on the premise that at their age they need to learn, not teach.

The true principles on this whole subject were in my judgment spoken by Mr. Justice McKenna for the Court in *Waugh* v. *Mississippi University* in 237 U. S. 589, 596–597. The State had there passed a law barring students from peaceably assembling in Greek letter fraternities and providing that students who joined them could be expelled from school. This law would appear on the surface to run afoul of the First Amendment's

freedom of assembly clause. The law was attacked as violative of due process and of the privileges and immunities clause and as a deprivation of property and of liberty, under the Fourteenth Amendment. It was argued that the fraternity made its members more moral, taught discipline, and inspired its members to study harder and to obey better the rules of discipline and order. This Court rejected all the "fervid" pleas of the fraternities' advocates and decided unanimously against these Fourteenth Amendment arguments. The Court in its next to the last paragraph made this statement which has complete relevance for us today:

> "It is said that the fraternity to which complainant belongs is a moral and of itself a disciplinary force. This need not be denied. But whether such membership makes against discipline was for the State of Mississippi to determine. It is to be remembered that the University was established by the State and is under the control of the State, and the enactment of the statute may have been induced by the opinion that *membership in the prohibited societies divided the attention of the students and distracted from that singleness of purpose which the State desired to exist in its public educational institutions.* It is not for us to entertain conjectures in opposition to the views of the State and annul its regulations upon disputable considerations of their wisdom or necessity." (Emphasis supplied.)

It was on the foregoing argument that this Court sustained the power of Mississippi to curtail the First Amendment's right of peaceable assembly. And the same reasons are equally applicable to curtailing in the States' public schools the right to complete freedom of expression. Iowa's public schools, like Mississippi's university, are operated to give students an opportunity to learn, not to talk politics by actual speech, or by "sym-

bolic" speech. And, as I have pointed out before, the record amply shows that public protest in the school classes against the Vietnam war "distracted from that singleness of purpose which the State [here Iowa] desired to exist in its public educational institutions." Here the Court should accord Iowa educational institutions the same right to determine for themselves to what extent free expression should be allowed in its schools as it accorded Mississippi with reference to freedom of assembly. But even if the record were silent as to protests against the Vietnam war distracting students from their assigned class work, members of this Court, like all other citizens, know, without being told, that the disputes over the wisdom of the Vietnam war have disrupted and divided this country as few other issues ever have. Of course students, like other people, cannot concentrate on lesser issues when black armbands are being ostentatiously displayed in their presence to call attention to the wounded and dead of the war, some of the wounded and the dead being their friends and neighbors. It was, of course, to distract the attention of other students that some students insisted up to the very point of their own suspension from school that they were determined to sit in school with their symbolic armbands.

Change has been said to be truly the law of life but sometimes the old and the tried and true are worth holding. The schools of this Nation have undoubtedly contributed to giving us tranquility and to making us a more law-abiding people. Uncontrolled and uncontrollable liberty is an enemy to domestic peace. We cannot close our eyes to the fact that some of the country's greatest problems are crimes committed by the youth, too many of school age. School discipline, like parental discipline, is an integral and important part of training our children to be good citizens—to be better citizens. Here a very small number of students have crisply and sum-

marily refused to obey a school order designed to give pupils who want to learn the opportunity to do so. One does not need to be a prophet or the son of a prophet to know that after the Court's holding today some students in Iowa schools and indeed in all schools will be ready, able, and willing to defy their teachers on practically all orders. This is the more unfortunate for the schools since groups of students all over the land are already running loose, conducting break-ins, sit-ins, lie-ins, and smash-ins. Many of these student groups, as is all too familiar to all who read the newspapers and watch the television news programs, have already engaged in rioting, property seizures, and destruction. They have picketed schools to force students not to cross their picket lines and have too often violently attacked earnest but frightened students who wanted an education that the pickets did not want them to get. Students engaged in such activities are apparently confident that they know far more about how to operate public school systems than do their parents, teachers, and elected school officials. It is no answer to say that the particular students here have not yet reached such high points in their demands to attend classes in order to exercise their political pressures. Turned loose with lawsuits for damages and injunctions against their teachers as they are here, it is nothing but wishful thinking to imagine that young, immature students will not soon believe it is their right to control the schools rather than the right of the States that collect the taxes to hire the teachers for the benefit of the pupils. This case, therefore, wholly without constitutional reasons in my judgment, subjects all the public schools in the country to the whims and caprices of their loudest-mouthed, but maybe not their brightest, students. I, for one, am not fully persuaded that school pupils are wise enough, even with this Court's expert help from Washington, to run the 23,390 public school

systems[4] in our 50 States. I wish, therefore, wholly to disclaim any purpose on my part to hold that the Federal Constitution compels the teachers, parents, and elected school officials to surrender control of the American public school system to public-school students. I dissent.

MR. JUSTICE HARLAN, dissenting.

I certainly agree that state public school authorities in the discharge of their responsibilities are not wholly exempt from the requirements of the Fourteenth Amendment respecting the freedoms of expression and association. At the same time I am reluctant to believe that there is any disagreement between the majority and myself on the proposition that school officials should be accorded the widest authority in maintaining discipline and good order in their institutions. To translate that proposition into a workable constitutional rule, I would, in cases like this, cast upon those complaining the burden of showing that a particular school measure was motivated by other than legitimate school concerns—for example, a desire to prohibit the expression of an unpopular point of view, while permitting expression of the dominant opinion.

Finding nothing in this record which impugns the good faith of respondents in promulgating the armband regulation, I would affirm the judgment below.

---

[4] Statistical Abstract of the United States (1968), Table No. 578, p. 406.