315 F.Supp. 289 (1970)
Manuel Rocky HERNANDEZ, by his next friend, Louis Ramirez, Daniel Manuel Martinez, by his next friend, Manuel Martinez, Pat Ulibarri, by his next friend, Jesse Ulibarri, Frank L. Luevano, by his next friend, Bea Phelps, Ronnie Freyta, by his next friend, Joel Freyta, Dan Pedraza, by his next friend Pauline Jimenez, Louis Anthony Martinez, by his next friend Ann Martinez, Juan (Jerry) Trujillo, by his next friend, Joseph Trujillo, Bill Cordova, by his next friend, Irene Cordova, Plaintiffs,
v.
SCHOOL DISTRICT NUMBER ONE, DENVER, COLORADO, the Board of Education, School District Number One, Denver, Colorado, William C. Berge, individually and as President, Board of Education, School District Number One, Denver, Colorado, Stephen J. Knight, Jr., individually and as Vice President, Board of Education, School District Number One, Denver, Colorado, James C. Perrill, Frank K. Southworth, John H. Amesse, James D. Voorhees, Jr., and Rachel B. Noel, individually and as members, Board of Education, School District Number One, Denver, Colorado, Robert D. Gilberts, individually and as Superintendent of Schools, School District Number One, Denver, Colorado, and Pete Shannon, individually and as Principal of North High School, Denver, Colorado, Defendants.
Civ. A. No. C-1813.
United States District Court, D. Colorado.
August 18, 1970.
*290 Edwin S. Kahn, ACLU Foundation of Colorado, Inc., Denver, Colo., for plaintiffs.
Benjamin L. Craig and P. M. Eggleston, Denver, Colo., for defendants.

MEMORANDUM OPINION AND ORDER
CHILSON, District Judge.
In September and October 1969, plaintiffs were students attending North High School in Denver School District No. 1.
On October 7, the plaintiffs were suspended and this action was instituted October 17, praying for a declaration that the suspensions were in violation of the plaintiffs' Federal Constitutional rights.
Trial was had to the court July 27, 1970, at which the Court heard the evidence, argument of counsel, received briefs, and took the matter under advisement. The Court is now duly advised.
The evidence consists of certain facts stipulated in the pre-trial order, certain documents, and the testimony of Mr. Shannon, the Principal of North High, who was the only witness. He was called by both the plaintiffs and the defendants, and his testimony and the other evidence in the case is undisputed.
The Court finds from this undisputed evidence that all of the plaintiffs are of Mexican descent and are referred to variously as "Mexicans", "Hispanos" and "Chicanos". In August of 1969, the plaintiff, Hernandez, the spokesman for the plaintiffs, asked if plaintiffs would be permitted to wear black berets and long hair while in school. As reasons for the request, it was stated that the wearing of the berets would be a symbol of their Mexican culture; it would show unity among Mexicans; it would be a symbol of respect, and a symbol of their dissatisfaction with society's treatment of their race, and their desire to improve that treatment.
Mr. Shannon, himself of Mexican descent, told the plaintiffs that he was a part of the same culture to which they referred and that he was sympathetic with their desire to generate respect for the Mexican culture. He told the plaintiffs that their request to wear long hair and black berets was new, but they *291 would be permitted to do so and "we would try and see if we could live with it."
In September, the plaintiffs requested permission to extend into the school system, a celebration of Independence Day of the Republic of Mexico (September 16) by having a walkout of students to participate in a parade and demonstration. Although this caused considerable apprehension among school officials and some students and parents, due to the fact that the previous spring, a demonstration at West High School in the Denver system had resulted in violence, destruction of property, and confrontations between students and police; nonetheless, Mr. Shannon not only granted the request, but he also arranged for assemblies at the school to explain the reason for and significance of the celebration on September 16 and to present appropriate Mexican entertainment.
In spite of the apprehension and tension attending these functions, no disruptions of the educational process, other than the absences due to the walkout, occurred. However, beginning early in September, and more particularly after September 16, the plaintiffs engaged in conduct which disrupted the school, its educational processes and discipline.
To quote the undisputed testimony of Mr. Shannon, the plaintiffs and other wearers of the black berets "* * * were becoming arrogant, and they were boisterous, and they were trying to have their way in the things in school."
The evidence is without dispute that the beret was used by the plaintiffs as a symbol of their power to disrupt the conduct of the school and the exercise of control over the student body.
That this conduct was disruptive and intentionally so, is demonstrated by the following uncontroverted facts. The plaintiffs walked in the hallways during class time talking in loud voices and from time to time, shouting, "Chicano power"; during passing periods, they congregated in the hallways to block the same from free passage by other students; they refused to give their names to the teachers and explain what they were doing in the hallways during class time; on at least one occasion, they attempted to interfere with the discipline of a student by the school officials; they caused a disturbance in the lunchroom; when a teacher supervising the hallways gave some students directions, one of the plaintiffs stated: "Don't listen to that old bagthe berets will take care of her"; when a teacher was reading in class a paper on the significance of September 16, the plaintiff, Hernandez, took the paper away from her and told her he knew more than she did about it; they attempted to induce students in class to leave the classrooms and join them in the hallways; and they refused to obey a requirement of the School Board that material to be distributed on school property be submitted in advance to the principal.
The effects of these disruptive tactics as shown by the undisputed evidence, were:
1. the creation of an atmosphere of apprehension and tension throughout the entire school;
2. disruption of the disciplinary processes of the school;
3. disruption of the teaching processes;
4. student fear and apprehension as demonstrated by two incidents: first, a group of Mexican students, (not wearers of the beret) reported to school authorities that the beret wearers were trying to tell them what to do and what not to do, and that they were worried about what would happen to them; the second involved non-Mexican students who reported to school authorities that if the school did not do something to protect them from the wearers of the berets, they would form a vigilante group to *292 take care of the beret wearers themselves;
5. apprehension among parents illustrated by the complaint of parents, that it seemed like the Commandos (beret wearers) were coming into the building and were putting fear in the other kids. "Are you allowing this? Can't you stop it?"
The evidence shows repeated attempts on the part of Mr. Shannon to induce the plaintiffs to change their conduct so that the operation of the school could proceed without disruption, but without success.
In a last attempt to avoid the necessity of suspension of plaintiffs, Mr. Shannon talked to their parents. In some cases he got support, and in other cases he did not; but in any event, he received no cooperation whatsoever from the plaintiffs.
Because the berets had become a symbol of this disruption, Mr. Shannon told the plaintiffs that they would have to cease wearing the berets within the school or be suspended.
Plaintiffs ignored this request and on October 7, 1969, Mr. Shannon suspended the plaintiffs for a period of five days and again attempted to resolve the difficulty by consultation with plaintiffs and their parents, but again without success. The suspension was extended by the Superintendent of Schools for an additional period of ten days, or until plaintiffs removed their berets, whichever was sooner.
This action was started on October 17, 1969, and on October 20, 1969, the plaintiffs' and defendants' counsel entered into a letter of understandng that the students would be allowed to return to school so long as they neither wore nor displayed their berets. Pursuant to this letter of understanding, the suspension was lifted and plaintiffs returned to school.
The plaintiffs raise three questions which we will consider.

WAS SUSPENSION OF THE PLAINTIFFS FOR WEARING BLACK BERETS A VIOLATION OF THE PLAINTIFFS' FIRST AMENDMENT RIGHTS TO FREE EXPRESSION?
Plaintiffs claim that the berets were worn as a political symbol and the ban on the wearing of the berets was a violation of their Constitutional right to free speech. They rely upon Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969), which held that the students in that case had a constitutionally protected right to wear armbands in class to express a political belief. However, the opinion in that case points up the limitations of that right as follows:
"But conduct by the student, in class or out of it, which for any reason whether it stems from time, place or types of behaviormaterially disrupts class work or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech."
It follows that the disruptive conduct of the plaintiffs in this case is "not immunized by the Constitutional guarantee of free speech."

WAS THE SUSPENSION UNLAWFUL BECAUSE OF THE SCHOOL BOARD'S REGULATIONS CONCERNING THE DISTRIBUTION OF LEAFLETS?
As we have previously mentioned, a regulation of the School Board provides that before material such as leaflets or literature can be distributed on school premises, the material must first be submitted to the principal who "* * * will decide if approval to distribute the material will be given." The plaintiffs assert that the regulation and the standards by which approval for distribution is determined constitute an improper restraint on the exercise of the plaintiffs' *293 first amendment rights and are therefore invalid.
The validity or invalidity of this regulation is not a justiciable issue in this case. The plaintiffs were not prevented from distributing material by the principal or anyone else; admittedly, they did distribute it. The suspension of the plaintiffs resulted from their refusal to obey the principal's order to stop wearing the berets; that order did not require plaintiffs' compliance with the above regulation as a condition for continued school attendance.
Similarly, the condition for lifting the suspension required only that plaintiffs neither wear nor display the berets and was not conditioned upon their compliance with the regulation controlling the distribution of material.
In these circumstances, the validity or invalidity of the regulation is not material to the determination of the issues in this case and the question raised is therefore not determined.

WERE THE PLAINTIFFS DENIED PROCEDURAL DUE PROCESS?
Plaintiff contends that procedural due process entitled plaintiffs, prior to their suspension, "to be heard at a meaningful time and in a meaningful manner, notice of the reason for the proposed governmental action, and an opportunity to confront adverse witnesses and present one's own arguments and evidence to an impartial decision maker."
The application of such a rule would mean that the plaintiffs could, and the evidence indicates they would, continue their disruptive conduct during the period that written charges were being prepared, an "impartial decision maker" selected, reasonable notice of the time and the place of the hearing given the plaintiffs, the time necessary to subpoena witnesses and the time required for the hearing. It takes no great imagination to realize that such a hearing as envisioned by the plaintiffs would consume many days if not weeks. In the meantime, the other students would be denied their right to the educational processes of the school. The requirements of procedural due process cannot be so construed.
Neither can a student be deprived of an opportunity to attend a public school without an opportunity for a fair hearing.
The Colorado Legislature recognized the problem and authorized a procedure for temporary suspension and a separate procedure for expulsion.
Colorado Revised Statutes, 1963, Chapter 123, Article 20, Sections 6 and 7, provide that a school board may delegate to a school principal, the power to suspend a pupil for not more than five school days for wilful disobedience or open and persistent defiance of proper authority or behavior which is inimicable to the welfare, safety, or morals of other pupils. It also authorizes the school board to delegate to the superintendent of schools, the power to extend the suspension for not to exceed an additional twenty school days.
The statute further provides that expulsion from or denial of admission to school attendance, beyond the temporary suspension period, shall not be made without a hearing if one is requested by the parent of the child, with the right of the parent to a judicial review of the decision of the board by the appropriate juvenile court.
Pursuant to this statute, the Denver School Board delegated to the principal and the superintendent, the power of temporary suspension of not to exceed twenty-five days and it was under the exercise of this delegated power that the principal and the superintendent temporarily suspended the plaintiffs from school attendance.
There is no evidence that the suspension period of twenty-five days is an unreasonable time to allow the principal and superintendent to attempt to resolve problems of discipline and behavior which is inimicable to the welfare, safety, *294 or morals of other pupils, before resorting to expulsion.
The Court concludes that the statutory procedures for temporary suspension are not a denial of procedural due process and that their application in this case did not deprive the plaintiffs of the procedural due process required by the Federal Constitution.
The Court concludes that the complaint is without merit and should be dismissed.
It is therefore ordered that judgment of dismissal of the complaint, with prejudice, be entered forthwith, and that the defendants have judgment for their costs to be taxed by the Clerk of the Court upon the filing of a bill of costs.