**Daniel CLOAK, a minor, by his father and next friend, Frank T. Cloak, Jr., Plaintiff,**

v.

**Wilmer CODY, individually and as Superintendent of the Chapel Hill City Board of Education; Woodrow W. Edmonds, individually and as Principal of the Grey Culbreth Junior High School, Chapel Hill; Roy Lindahl, Mary Scroggs, Paul N. Guthrie, Jr., Norman Weatherly, Marvin Silver, Everett Billingsley, and Samuel Holton, individually and as members of the Chapel Hill City Board of Education, Defendants.**

United States District Court,
M. D. North Carolina,
Durham Division.

May 12, 1971.

Norman B. Smith, of Smith & Patterson, Greensboro, N. C., for plaintiff.

Emery B. Denny, Jr., of Haywood, Denny & Miller, Chapel Hill, N. C., for defendants.

## MEMORANDUM OPINION

EDWIN M. STANLEY, Chief Judge.

The minor plaintiff, on behalf of himself and on behalf of others similarly situated, seeks injunctive relief and monetary damages against the defendants by reason of the fact that the minor plaintiff was denied the privilege of selling newspapers at a public school in Orange County, North Carolina, in which the minor plaintiff was enrolled as a student.

Following joinder of the issues, the parties stipulated the facts and submitted the matter to the Court for decision on the stipulated facts and briefs.

The pertinent facts are as follows:

1. Plaintiff Daniel Cloak, by his father and next friend, Frank T. Cloak, Jr., is a citizen of the United States. Until on or about October 22, 1969, he was a student in good standing at the Grey Culbreth Junior High School. Following that date, he was suspended from school for three days and was further prohibited from engaging in certain

conduct, as set forth more fully herein below. He formerly resided at 121 Kenan Street, Chapel Hill, North Carolina. Plaintiff, since the time of the occurrences herein described, has moved from the State of North Carolina and no longer attends any public school within this State.

2. Defendants Lindahl, Scroggs, Guthrie, Weatherly, Silver, Billingsley, and Holton are citizens of the United States and of the State of North Carolina, and are now and were at all times material hereto the duly elected, qualified, and acting members of the Chapel Hill City Board of Education. As such, defendant board members have under their control all public schools and the respective officials and teachers of all public schools within the Chapel Hill city administrative unit. Defendant board members have general supervision over the enforcement of rules and regulations authorized by State law to be prescribed by the board for the conduct of all public schools within said unit.

3. Defendant Wilmer Cody is now and was at all times material hereto the Superintendent of the Chapel Hill City Administrative School District, and is responsible for the enforcement of rules and regulations prescribed by the aforesaid school board for the administration of said public school district.

4. Defendant Edmonds is now and was at all times material hereto the Principal of the Grey Culbreth School, a Junior High School within the jurisdiction of the Chapel Hill City Administrative School District, and is responsible for the enforcement of rules and regulations prescribed by the aforesaid school board for the administration of said public school within the aforesaid public school district. In his official capacity, he was responsible for the suspension of plaintiff Cloak and the continued prohibition of newspaper sales on the school grounds which this lawsuit seeks to enjoin.

5. On September 25, 1969, plaintiff Cloak, an eleven-year-old student at the Grey Culbreth Junior High School distributed free of charge the *Protean/Radish* newspaper at said school. There was no commotion or disturbance connected with this distribution. On several occasions thereafter, the plaintiff and his sister, Connie Cloak, distributed the *Protean/Radish* newspaper free of charge without incident.

6. On September 30, 1969, the plaintiff and his sister sold the *Protean/Radish* newspaper at the Grey Culbreth Junior High School. On that date, plaintiff and his sister were stopped by defendant Edmonds, principal of said school, who told them "selling" (and soliciting donations) on school grounds was prohibited. Thereafter, on October 16, 1969, plaintiff sought defendant Cody's permission to sell the *Protean/Radish* newspaper on school grounds, which permission was denied, and upon inquiry by plaintiff as to what step he could take to have the decision overruled, he was advised that an appeal or request to the Board of Education would be appropriate.

7. Plaintiff appeared at a meeting of the Board of Education on October 20, 1969, and requested that he be permitted to sell the newspaper, the *Protean/Radish,* at the junior high school. At this time defendant Cody stated that, "School policy specifies that items can be sold in the schools only with the Superintendent's approval. Items sold in school are limited to school supplies and student newspapers. To avoid having to decide on every item someone wanted to sell, the procedure has been to interpret the policy very narrowly. The school board does prohibit the solicitation of funds by students, on this basis. The students have been asked not to ask for donations for these newspapers on the school grounds." Plaintiff at this meeting stated that his purpose for selling the newspaper at the junior high school was for two reasons, first, for students to be informed of what is going on, and second, to help a friend who had many debts to pay. The chairman of the school board said a decision would be made at a future meeting. At this time the writ-

ten policy of the board of education read as follows: "No funds for non school purposes may be collected in the school, and no commercial organization may market or advertise its products through the school without the Superintendent's approval. No non school groups or individual may seek publicity or recruit in a school without the Superintendent's approval."

8. On October 22, 1969, while the school board had under consideration plaintiff's request, plaintiff again sold the *Protean/Radish* newspaper at Grey Culbreth Junior High School. Later that day he was suspended from school for three days by defendant Edmonds for violating the directions previously given him not to sell or offer the paper for sale on school grounds.

9. On November 3, 1969, plaintiff attended a regular school board meeting. The board then adopted a policy regulation, which provides:

> No individual or non-school sponsored group be permitted to either solicit the sale of any item or seek contributions for any item or cause at any of the schools within the Chapel Hill City School System.

Defendants Silver and Guthrie voted against the motion adopting said policy.

10. Plaintiff's sister informed the Board of Education at the November 3, 1969 meeting that she and plaintiff were interested in organizing a club to distribute and sell newspapers. She said they were at the meeting to ask defendant Cody and inform defendant Edmonds of this interest. Plaintiff talked informally with one of the defendant members of the Board of Education, and plaintiff was informally advised by said defendant that he might want to form a club, whose members would purchase newspapers and meet regularly under the guidance of a school staff member to discuss the contents of the newspapers. None of the defendants, however, agreed that sale of newspapers on the school premises would be permitted.

11. Plaintiff submitted to defendant Edmonds a proposal for the formation of a school organization and request for school sponsorship of an organization to be known as Phillips-Culbreth Freedom of the Press Club. The proposal contained a constitution, as follows:

### CONSTITUTION

*Purpose:* To make available to the student body, through selling and distribution, all types of newspapers.

*Article I:* There will be no censorship within club-sold newspapers, as long as they are newspapers.

*Article II:* All non-club used profit is to be turned over to the school.

*Article III:* There are to be no officers other than a treasurer and a publisher correspondent.

*Article IV:* There will be no discrimination about acceptance of club members.

*Article V:* Amendments are to be passed by 90% of total club membership.

The planned activities of the club were designated in the proposal as follows:

### PLANNED ACTIVITIES

(1) presentation for sale to students of the following newspapers, beginning Monday, November 17, 1969: Raleigh, N. C. *News and Observer;* University of North Carolina *Daily Tar Heel; Chapel Hill* (N.C.) *Weekly;* Chapel Hill (N.C.) *Protean/Radish;* Durham, N.C. *Anvil;* Raleigh, N. C. *Carolina Times;* and the Malcolm X Liberation University student newspaper, when it becomes available.

(2) purchase of literature—pamphlets, magazines, etc.—for free distribution to the students, as funds become available.

(3) organizing of panel discussions, forums, and the like, on the general subject of freedom of the press, and freedom of speech, from time to time.

Officers of the club and proposed faculty advisers were set out in the proposal.

12. Plaintiff and his sister, on November 15, 1969, made informal inquiry of defendant Cody that he approve the Freedom of the Press Club. Plaintiff Cloak, if placed under oath, would testify that as a result of this conversation he formed a belief that approval had been given to the formation and activities of the Freedom of the Press Club. Defendant Cody, if placed under oath, would testify that such approval was never given, and that he did not make any statement to plaintiff calculated to create the impression that such approval had been given; defendant Cody would further testify that plaintiff stated he would proceed to sell the newspapers even in the absence of approval of the club.

13. On November 17, 1969, plaintiff and other members of the Freedom of the Press Club set up a table at the Grey-Culbreth Junior High School to sell the *Carolina Times* and the *North Carolina Anvil*. Defendant Edmonds informed them that they could not sell the papers on the school premises.

14. At no time during the course of the efforts at the school premises to sell or distribute the newspapers was any physical disturbance caused, or the threat of one even suggested.

15. On December 15, 1969, plaintiff and several members of the North Carolina Civil Liberties Union met with defendants Edmonds and Cody and proposed a particular time (after school hours), and a place (adjacent to the Snack Bar), be set aside for the sale and distribution of newspapers. Defendant Cody denied the request, citing the following reasons:

(a) That neither the Principal nor the Superintendent had ever approved the sale of newspapers on school premises nor the formation of a school sponsored club with this as its sole purpose;

(b) That the Executive Board of the School PTS had recommended disapproval of these activities.

(c) That the reason for the decision was that such sales by individuals or groups of individuals did not satisfy the criterion applied to all selling activities on the school grounds. These are generally that the school program did not require that newspapers be available for purchase at school, that the school operation created no hardship that would be satisfied only by being able to purchase the newspaper, i. e., as in the case of snack shops by reason of lengthy intervals between meals and the termination of the school day, no school tradition was involved, and that the parents of the students did not want this to be available.

Plaintiff requested review of this decision by the Board of Education. Defendant Cody promised to, and did place the matter on the agenda of the Board of Education for their consideration.

16. In January, 1970, plaintiff submitted a memorandum (prepared by the North Carolina Civil Liberties Union) to the members of the school board, and a supplemental memorandum, dated February 26, 1970, was also filed with the school board. Plaintiff requested that the matter be placed on the agenda for the next regular meeting of the Board of Education on March 9, 1970.

17. On March 9, 1970, representatives of the North Carolina Civil Liberties Union, who stated that they were appearing in behalf of plaintiff, attended a meeting of the Board of Education, and agreed with defendant Cody's suggestion that the constitutional issues presented to the board in connection with plaintiff's claim should be deferred until the attorney for the Board of Education had responded to the arguments submitted by the North Carolina Civil Liberties Union. Thereafter, the matter was referred to the attorney for his comment.

18. On April 30, 1970, the school board attorney submitted a legal memorandum to defendants on this subject. On May 4, 1970, plaintiff filed a response thereto.

19. On May 4, 1970, defendant Board of Education met and deferred action until the school board attorney could respond to the memorandum filed that day by plaintiff.

20. On May 18, 1970, the attorney for the Board of Education advised the board that in his opinion the Board of Education had the authority to adopt a policy regulating the sale or solicitation of items on school grounds and that the existing policy of the Board of Education prohibiting individuals and non-school sponsored groups from selling any items or seeking contributions for any items or causes at any of the schools within the Chapel Hill School System did not violate the provisions of the First Amendment to the Constitution of the United States, when applied to the sale of newspapers, and that the existing policy of the Board of Education by its terms or by its application in this case did not violate the provisions of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

21. On May 18, 1970, the Chapel Hill City Board of Education adopted a motion unanimously reading as follows:

That since the Administration has judged that the primary purpose of the "Free Press Club" is to sell and this is against the Board Policy, this Board has no basis to reverse the Administration's decision.

The Superintendent thereupon denied the request of the plaintiff that the "Free Press Club" be given official sanction and be permitted to sell newspapers on the school premises at a time and place to be agreed upon.

22. Insofar as administrative appeals are concerned, plaintiff has exhausted his administrative remedies. However, defendants do not concede that plaintiff's judicial remedies have been exhausted within the Courts of the State of North Carolina.

23. Plaintiff Cloak, if placed under oath, would testify that the aforesaid sales of newspapers were not primarily undertaken out of commercial motivation, and that plaintiff's primary purposes were educational; plaintiff would further testify that he and the other members of the "Free Press Club" wished to have the right to distribute or sell the newspapers on the school grounds because most children ride to school and it is not possible to reach them anywhere else.

24. Defendant Cody, if placed under oath, would testify that in his opinion and belief, based upon his investigation, that the primary purpose of the "Free Press Club" and the request to sell newspapers was primarily undertaken out of commercial motivation, although there might have been some educational consideration.

25. Some sales and solicitations are currently permitted on some school grounds under defendants' jurisdiction, when they meet the criteria heretofore set forth, that is, the school program requires it, the school operation created the hardships sought to be satisfied, or that school tradition was involved. Sales of school pictures, school supplies and yearbooks, and in some instances the operation of a snack bar, are permitted in the schools of the Chapel Hill City School District. All of these items, although actually sold by students in some instances, are funded, purchased, and accounted for through the financial and auditing procedures of the Chapel Hill City Administrative Unit, with the principal or other administrative official of the school writing checks, receiving funds, and being generally responsible for the operations. At the Senior High School, orders for class rings are taken at non-school hours (i. e. Saturday), with later delivery of the rings to students off the school premises.

## DISCUSSION

■ It should be kept in mind that, notwithstanding the plaintiff's argument to the contrary, we are not dealing with a First Amendment problem. The regulation complained of involves a commercial transaction rather than a constitutionally protected free expression.

■ The power of boards of education to regulate the commercial sale of merchandise at public schools is to be found in § 115–35(f), General Statutes of North Carolina, which is as follows:

"(f) Power to Regulate Fees, Charges and Solicitations.—County and city boards of education shall adopt rules and regulations governing solicitations of, sales to, and fund raising activities conducted by, the students and faculty members in schools under their jurisdiction, and no fees, charges, or costs shall be collected from students and school personnel without approval of the board of education as recorded in the minutes of said board; provided, this section shall not apply to such textbook fees as are determined and established by the State Board of Education. All schedules of fees, charges and solicitations approved by county and city boards of education shall be reported to the State Superintendent of Public Instruction."

Plaintiff's reliance upon Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L. Ed.2d 731 (1969) is misplaced. There the Court was dealing with the right of students to wear black arm bands symbolic of their opposition to the Vietnam war. This was held to be a symbolic act, and was thus within the Free Speech clause of the First Amendment. As earlier noted, there is no First Amendment right here involved. There was no attempt to prevent plaintiff from giving away or distributing his newspapers in any manner he saw fit. The real issue at stake is whether a solicitation or commercial activity, such as the sale of newspapers, is within the power of the school board to regulate. Plaintiff argues that because the distribution of the newspaper is constitutionally protected that he should be allowed to *sell*. There is no merit to this argument. If plaintiff, and the class he represents, cannot be prohibited from exercising a clear commercial activity, then all other children attending the Chapel Hill schools can sell any commodity they like. Under these circumstances, it is not difficult to imagine the chaos that would result.

For the sake of emphasis, it should again be made unmistakably clear that none of the defendants, individually or collectively, attempted in any way to interfere with the plaintiff's right to distribute his newspapers on the campus. It was only after it became a commercial venture that the board acted.

In Breard v. Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), the defendant "was arrested while going from door to door in the City of Alexandria, Louisiana, soliciting subscriptions for nationally known magazines." A city ordinance prohibiting such conduct without a license was upheld. Surely, local school boards have as much right to regulate such activities as did the City of Alexandria.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter.

2. The plaintiff is not entitled to the monetary damage and injunctive relief prayed for.

A judgment will be entered accordingly.