**Khodadad ADIBI–SADEH, Individually and on behalf of all others similarly situated**

v.

**BEE COUNTY COLLEGE et al.**

**Civ. A. No. C–78–35.**

United States District Court,
S. D. Texas,
Corpus Christi Division.

May 2, 1978.

Sauer & Hormachea, Nancy Hormachea, Houston, Tex., for plaintiffs.

Kleberg & Weil, Lev Hunt, Corpus Christi, Tex., Handly & Williams, Marion E. Williams, Jr., Beeville, Tex., for defendants.

## MEMORANDUM AND ORDER

OWEN D. COX, District Judge.

On March 23, 1978, the Plaintiff, Khodadad Adibi-Sadeh, filed this lawsuit individually and on behalf of all others similarly situated seeking to enjoin Bee County College and the other Defendants[1] from continuing to conduct disciplinary proceedings against them at the college.

The application of the originally named Plaintiff, Adibi-Sadeh, for temporary restraining order was denied on March 23, 1978. Thereafter, a hearing on the preliminary injunction was commenced on April 6, 1978. On April 7, 1978, the Court, without objection from any of the parties, consolidated the trial on the merits with the hearing on the preliminary injunction, pursuant

1. Named Defendants are: BEE COUNTY COLLEGE; GRADY HOGUE, President, Bee County College, Individually and in his official capacity; FRANK JOSTES, Chairman, Board of Trustees, Bee County College, Individually and in his official capacity; R. W. DIRKS, Vice-Chairman, Board of Trustees, Bee County College, Individually and in his official capacity; HENRY MEDINA, Secretary, Board of Trustees, Bee County College, Individually and in his official capacity; ROBERT J. BEASLEY, Trustee, Bee County College, Individually and in his official capacity; FRED C. LATCHAM, JR., Trustee, Bee County College, Individually and in his official capacity; PETER S. MARECEK, Trustee, Bee County College, Individually and in his official capacity; E. C. SPELLMAN, Trustee, Bee County College, Individually and in his official capacity; GEORGE F. ELAM, Dean of Student Services, Bee County College, Individually and in his official capacity; ALGIA ALLEN, Academic Dean of Bee County College, Individually and in his official capacity; MR. BRYANT, Individually and Chairman of Student Affairs Committee, AND OTHER UNKNOWN MEMBERS OF THE STUDENT AFFAIRS COMMITTEE, Bee County College, Individually and in their official capacities.

to Rule 65(a)(2), Federal Rules of Civil Procedure. Then, the trial was recessed until the 13th day of April, 1978. On that date the Court certified the Plaintiffs' class in accordance with Rule 23(c), Federal Rules of Civil Procedure, and identified the class as ninety (90) Iranian students arrested in the gymnasium at Bee County College on the 9th day of March, 1978, and who thereafter went before the college disciplinary committee and were either dismissed from school or otherwise punished.

Whereupon the Court proceeded with the trial on the merits. The transcript of the taped testimony of certain Plaintiffs given during the administrative proceedings before the appropriate Defendants was admitted in evidence. At the conclusion of the evidence presented before this Court, the parties rested. The Court then announced that it would take the case under advisement. The purpose of this memorandum is to set forth the Court's findings of fact and conclusions of law herein.

### Findings of Fact

1. The Plaintiffs, who have been designated as a class, are enrolled as students at Bee County College, Beeville, Texas. They were lawfully admitted to the United States with non-immigrant student visas issued by the Immigration and Naturalization Service of the United States Department of Justice.

2. Bee County College (hereinafter referred to as BCC) is a state-supported junior college located in Beeville, Bee County, Texas. It has an enrollment of approximately 2100 students who pursue various vocational and technical programs. Approximately ten percent (10%) of the student body are Iranian citizens. The sole purpose of BCC is to offer educational opportunities to the students enrolled there.

3. Sometime prior to March 7, 1978, Grady Hogue, President of BCC, began receiving complaints about the Iranian students enrolled in the college. The complaints came from local police and postal authorities, local citizens and businessmen, various college administrators and teachers, and non-Iranian students at BCC.

4. The complaints alleged failure to pay rent, bad checks, unauthorized phone calls to Iran on college telephones, unlawful filling of private mailboxes with the Iranian Student Association newspaper *Resistance*, intimidation of non-Iranian students by Iranian students, and cheating on college examinations.

5. On March 7, 1978, Grady Hogue notified one of the Iranian students, Mr. Afzali, that he wanted to talk with all of the Iranian students about the complaints he had received. Mr. Hogue had Mr. Afzali prepare notices written in the Persian language (the students' native language) to the effect that the Iranian students were to meet with Mr. Hogue in the BCC gymnasium on March 9, 1978, at 11:30 a.m. The notices were posted and the meeting was held as scheduled.

6. Approximately one hundred (100) Iranian students and ten (10) Iranian non-students attended the meeting. They were seated in bleachers on the floor of the gymnasium. Mr. Hogue explained to the students that he had received numerous complaints about their behavior, and that their behavior was creating a bad image not only for themselves but also for BCC. He asked them to try to determine among themselves who was creating the problems and then put a stop to it.

7. After Mr. Hogue finished his talk with the Iranians and had left the building, a foreign language teacher repeated in the Persian language what Mr. Hogue had said. After the teacher concluded translating Mr. Hogue's comments, the students remained seated in the bleachers.

8. At approximately 1:00 p.m. on the same day, the students were still in the gymnasium. Mr. Hogue returned to the gymnasium at the request of the Academic Dean. At that time the students demanded that Mr. Hogue answer their questions regarding the alleged misconduct, and he did so. However, after ten or fifteen minutes of this activity, Mr. Hogue told the students that he would no longer answer questions

because `physical education classes were scheduled in the gymnasium and they would have to get out to accommodate the classes. The students still refused to leave, and there was considerable chanting and clapping.

9. Between 1:00 p. m. and 2:45 p. m., the students were repeatedly asked to clear the gymnasium by Mr. Hogue, several teachers, and finally, the Chief of Police of Beeville, Texas. The students remained steadfast in their refusal to budge. During this period of time several regularly scheduled physical education classes were unable to meet because of the students' occupation of the gymnasium. The bleachers were occupied by the students and could not be moved off the gymnasium floor. So, the scheduled fencing and badminton classes could not be held.

10. Mr. Hogue also testified that a large group of *non*-Iranian students gathered near the gymnasium. They were angered by the actions of the Iranian students and wanted to enter the gymnasium and physically remove the Iranians. In order to prevent a confrontation between these two groups, Mr. Hogue ordered the gymnasium closed.

11. At approximately 2:45 p. m., after the Iranian students had refused to comply with the repeated, official demands to vacate the gymnasium, they were arrested and taken to jail. The majority of the Iranians had no identification on them when arrested and initially gave the police officers false names. However, the true names of those arrested were soon ascertained.

12. On March 13, 1978, the Dean of Student Services, George F. Elam, and the Chairman of the Student Affairs Committee, Douglas Bryant, met. A complaint had been made regarding the Iranian students' behavior on March 9, 1978, and Elam told Bryant that the Student Affairs Committee (SAC) should be convened to hear the complaint. Bryant and Elam were aware of the need to satisfy due process requirements and, considering the number of persons involved, they decided to hold the initial hearing on March 21, 1978, at 9:00 a. m. Thus, there was time for adequate notice to the students involved.

13. In order to fully advise the students implicated, Mr. Elam prepared a form letter addressed to those involved in the March 9 incident (Plaintiffs' Exhibit # 1), which explained that they had been placed on disciplinary probation because of their participation in the incident. The allegations of their unacceptable conduct were based on reports from the President and Academic Dean of BCC and the records of the Beeville Police Department. The letter informed the students that their action was "in violation of the college 'Policy of Rights, Conduct, and Responsibilities' as stated on pages 57–59 of the 1977–78 catalog of Bee County College, paragraphs (a), (b), (g), and (1)." (Plaintiff's Exhibit · # 1) The students were further advised by such letter that a hearing would be held on March 21, 1978, at 9:00 a. m. in the Fine Arts Auditorium, BCC, before the Student Affairs Committee. Also, the procedure to be followed was outlined. The college officials would present the formal charges and, subsequently, the students could present their answers. The students were also advised that they could have someone to assist them at this hearing and a record of the proceedings could be made. The letter went on to explain that, after the March 21st hearing, the SAC would make a recommendation of action to Mr. Elam who would decide what course of action to take. Any student dissatisfied with Mr. Elam's decision could appeal. The letter also set out the range of disciplinary action possible.

14. The above-described letter prepared by Mr. Elam was mailed, on Wednesday, March 15, 1978, to ninety-five (95) Iranian students by certified United States mail, return receipt requested, restricted delivery. Although the testimony was conflicting as to when actual delivery was made of the letters, the Court finds that most of the letters were delivered no later than Friday, March 17, 1978. The testimony was uncontradicted that some (the exact number being unknown) of the letters were returned to BCC undelivered.

However, notice of the March 21 hearing was given to the offenders in two other ways. In addition to mailing the form letter, copies of it were hand-delivered to many of the Iranian students on or before March 17, 1978. The Iranian students involved in the March 9 incident were advised by notices posted on the campus that they should seek messages directed to them at specific locations on the campus. Taking into account the size of the college, the several reasonable ways notice to the offenders had been given, and the reasonable assumption that the Iranian community at the school is closely knit, the Court finds all of the members of the class had fair and adequate notice of the hearing.

15. On Tuesday, March 21, 1978, the hearing commenced as scheduled before the Student Affairs Committee. That committee consists of four faculty members and four student members who hear cases involving student disciplinary action.

16. At the initial hearing, all the Iranian students who were charged with disciplinary violations were present and represented by an attorney of their choice. As the students first appeared for the hearing, each was given written notice that he or she would be entitled to have an individual hearing following the presentation of the charges and evidence against them by the college. This notice gave the date, time, and place of each individual hearing. The students were advised that they could respond to the charges, bring legal counsel or someone else to represent them and make a recording of the proceeding. They were further advised that they could appear or refuse to appear, as they so chose, but if they did not appear, a decision would be made without their testimony.

17. The initial hearing commenced with Mr. Elam representing BCC and acting in the role of prosecutor. At the outset, he went into great detail explaining the nature of the proceedings and the exact charges against the students. The charges against the students were:

(a) "disrupting or obstructing, or attempting to disrupt or obstruct, any lawful activity of the College, or violating H.B. 141, as enacted by the 61st Texas Legislature."

(b) "interfering with or attempting to interfere with, the lawful exercise of freedom of speech, freedom of movement, freedom of peaceable assembly, or other rights of individual or groups."

(c) "engaging in any obscene, profane, reckless, tumultuous, destructive, or unlawful course of conduct." and

(d) "refusing or failing to comply with a lawful order of any College or public official acting in the performance of his duties in the administration and enforcement of these policies."

Mr. Elam explained specifically the regulations violated and the basis for each charge made against the students.

18. Mr. Elam then called witnesses, who testified concerning the disruptive activities of the Iranian students on March 9 at the gymnasium. Mrs. Hormachea, the attorney representing the students, was given an opportunity to cross-examine each witness, but she refused to do so. She stated that she wished to cross-examine each of the witnesses who appeared on March 21st at each separate hearing. To grant her request would have required each witness for the school to repeat their testimony many times. Her request to do this was not reasonable and was properly denied. Ms. Hormachea made a judgment determination in refusing to cross-examine the school witnesses at the time provided for such examination, and by doing so she waived cross-examination of the witnesses who were called by Mr. Elam.

19. Following the initial hearing of March 9th, the separate hearings as to the unruly Iranian students were held on March 21, 22, and 23, 1978. Each individual student was given the opportunity to present his or her side of the story. Six or seven of the students did this. The others refused to testify at the individual hearings, electing instead to assert their Fifth Amendment right against self-incrimination because of pending criminal trespass charges which had been filed against them.

20. At the conclusion of the individual hearings, the Student Affairs Committee sustained the recommendation of the Dean of Student Services of immediate dismissal for all but six of the Iranian students. The SAC decision as to those six students was that they remain on disciplinary probation for varying periods of time. The evidence established that some, but not all, of the students who elected to testify were continued on probation. There was no evidence whatsoever that the students' assertion of their Fifth Amendment rights was used against them.

21. The students have appealed the decision of the SAC and a final decision has not yet been made by BCC officials.

### Conclusions of Law

1. The Court has jurisdiction of this matter by virtue of 28 U.S.C. §§ 1331, 1343, and 2201; venue is proper by virtue of 28 U.S.C. § 1391.

■ 2. This action was properly brought as a class action pursuant to Rule 23, Federal Rules of Civil Procedure, because the class represented by the named Plaintiff consists of approximately ninety (90) students at BCC; joinder of this many people would be impracticable. The questions of law and fact are the same for all ninety (90) students and the named Plaintiff. The Court is also of the opinion that the named Plaintiff fairly and adequately protected the interests of the class. In addition, the Defendants acted on grounds applicable to the entire class, thereby making appropriate a final determination with respect to the class as a whole. The class represented by the named Plaintiff, Khoadadad Adibi-Sadeh, was thus certified in open court as the group of approximately ninety (90) Iranian students who were arrested at the BCC gymnasium on March 9, 1978, and against whom disciplinary action was taken by the SAC, resulting in either dismissal from BCC or other punishment.

■■ 3. The first complaint made by the Plaintiffs herein is that their First Amendment rights of freedom of speech and assembly were violated by the BCC officials and that they were punished for exercising said rights. Although it is without doubt that students enjoy First Amendment rights, it is equally clear that those rights do not allow students to "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Burnside v. Byars,* 363 F.2d 744 (5th Cir. 1966); *Tinker v. Des Moines School Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1968). The Plaintiffs created a substantial and material interference with the operations of BCC on March 9, 1978, by forcing the cancellation of several classes and the ultimate closing of the gymnasium. Such action was not protected by the First Amendment.

4. The Plaintiffs also allege that the procedures implemented by the Defendants in the course of the disciplinary proceedings were constitutionally defective in a number of respects. It is contended by the Plaintiffs that they did not receive prior notice of the hearing, the nature of the charges and the evidence and witnesses that would be used against them. They further contend that they were denied the right to counsel and the right to cross-examination. The Plaintiffs also contend that they were denied their right to remain silent and were punished for asserting their right to remain silent. This Court finds that the findings of fact previously made refute such allegations.

■ 5. There is no doubt that in a situation such as the present case, where students face the possibility of suspension or expulsion from a state-supported school, account must be taken of the Due Process Clause. *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1974). "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471 at 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484. It has long been the rule that the concept of due process is a very flexible one which must be examined in light of the facts of each individual case. *Goss v. Lopez, supra; Cafeteria Workers v. McElroy,* 367 U.S. 886, 81

S.Ct. 1743, 6 L.Ed.2d 1230 (1961); *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). "Basic fairness and integrity of the fact finding process are the guiding stars." *Burnside v. Byars, supra.*

6. The rights to notice and a hearing before expulsion from a tax-supported college were first secured in the Fifth Circuit in *Dixon v. Alabama State Board of Education,* 294 F.2d 150 (5th Cir. 1961), *cert. den.,* 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193. After holding that notice and a hearing were required, the Court sets out the requirements of due process in such a case. Those requirements are:

(a) a statement in the notice of the specific charges and grounds which, if proven, would justify expulsion under the college's regulations.

(b) a hearing which (in the case of a charge of misconduct) "gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail . . . . . This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required." *Dixon, supra,* at 159.

(c) "the names of the witnesses . . . and an *oral or written* report on the facts to which each witness testifies." *Dixon, supra,* at 159 (emphasis supplied).

(d) the opportunity to present a defense including either oral testimony or written affidavits.

(e) "If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection. If these rudimentary elements of fair play are followed in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled." *Dixon, supra,* at 159.

7. It is the opinion of this Court that the Defendants complied with the above requirements in a commendable fashion and that the Plaintiffs were, therefore, afforded ample due process.

(a) On March 15, 1978, Mr. Elam mailed each member of the class a letter notifying him (her) of the March 21 hearing, the charges, the right to bring counsel, and whose reports were the basis of the charges. Notice of the same facts was also given by personal delivery of a copy of the letter and by posting notices around the BCC campus informing the students of a message for them and where to obtain the message.

(b) The initial group hearing and the individual hearings which followed gave the SAC an opportunity to hear both sides of the story in considerable detail. The students were represented by counsel at the hearing and afforded an opportunity for cross-examination. They chose, through counsel, to forego this opportunity to cross-examine.

(c) The students were notified in Mr. Elam's letter of the names of some of the witnesses who submitted reports which resulted in the disciplinary proceedings. At the initial hearing, prior to the individual hearings, the students heard each witness testify as to the facts of the March 9 incident.

(d) The students were all given individual hearings with the opportunity to tell their side of the story and present their own witnesses. Some did testify but most refused, asserting their Fifth Amendment right to remain silent. Having chosen to remain silent, the students cannot now complain that they were deprived of the right to testify in their own behalf. Nor can they assert such right as a means of preventing the committee from considering the evidence before it.

(e) The hearing was held before the SAC, which committee was charged with deciding whether to accept or reject the recommendation of dismissal.

The students were present at the hearing and heard the evidence.

8. The Court having found that the Plaintiff and the class he represents were afforded ample due process, judgment shall issue that Plaintiff take nothing.

9. Any finding of fact that is also a conclusion of law is hereby adopted as a conclusion of law; any conclusion of law that involves a finding of fact is hereby adopted as a finding of fact.

IT IS SO ORDERED.