**Sheila BAHR, as next of friend of Nancy Bahr, Plaintiff,**

v.

**James JENKINS, Principal of Dixie Heights High School, et al., Defendants.**

**Civ. A. No. 82–70.**

United States District Court, E. D. Kentucky, Covington Division.

May 20, 1982.

David E. Davidson, Kevin D. Hill, Covington, Ky., for plaintiff.

Robert E. Ruberg, Covington, Ky., for defendants.

BERTELSMAN, District Judge.

## Introduction

Some explanation is due the reader for the informality of the following opinion, which apparently concerns an issue of first impression. Because an immediate decision was required it had to be delivered orally, before the plaintiff's suspension expired, and edited for inclusion in the record and publication later.

Essentially, the facts are that on a spring day at the Dixie Heights High School in Kenton County, Kentucky, the work of the school was disrupted by numerous miscreant students setting off "party poppers," a type of small legal firecracker. Several of the youthful culprits, on being apprehended, implicated the plaintiff, a freshman, as the source of this distracting influence. The authorities demanded that she open or surrender her purse so that they could see if she was the one who was distributing the party poppers. Upon her refusal to surrender the purse, she was suspended for five school days. Thus are the origins of this federal case. A full statement of the facts appears in the stipulation of the parties attached as an appendix. It should be noted in addition that all persons involved are of the same race, so that there are no racial overtones involved.

### Findings of Fact Conclusions of Law

I am going to follow my usual custom in these cases where it is necessary to get a decision out with some rapidity. I am going to deliver an oral opinion which will contain the findings of fact and conclusions of law of the court. It will be written up by the court reporter. I reserve the right to edit the opinion. I will probably, because of the public interest in this matter, deliver this oral opinion in a somewhat conversational manner. For the version that goes into the record, I certainly will add some citations. So I am going to omit in these oral remarks any citations to cases. They will be supplied later. The principles of law that I will refer to are well supported by cases but for the purposes of this oral opinion, I think it would not be appropriate for me to be citing and discussing cases. It

wouldn't mean much to most of you who are listening to me, anyway.

The findings of fact in this case are contained in the stipulation and the attachments, including the letter and the Code of Conduct and anything else that might have been attached to the stipulation. I think it's appropriate perhaps in the beginning to state as I have on many occasions my philosophy, and I think the proper philosophy, as to the role of the federal court vis-a-vis state institutions.

Many of us forget that the primary protection of liberty that the founders put into our Constitution is the division of powers between the federal and state governments. We have a Bill of Rights that receives most of the attention. But what many forget is that in the original document there was no Bill of Rights. The men who drafted the original document, Washington, Madison and the others, relied primarily, for the protection of individual freedom, on the limitations of the powers granted to the federal government by that document. This principle has come to be known as the separation of powers. The framers thought that this was sufficient in and of itself to be a preservation of liberty. Subsequently the Bill of Rights, with the enumerated rights with which most of us are familiar, were added, and even later yet these rights were made applicable to the states. I think that this history requires that we all remember in coming to the federal court with some complaint about what is going on in a state institution that the federal court has no general supervisory power over any state institution, such as a school, prison, hospital or college.

The role of this court is that if there is a clear violation of federal constitutional rights, then it should interfere insofar as it is necessary to correct that violation. And when those cases have come in here where that has been clearly presented that is what we have done. On the other hand, though, we have no general supervisory role over state institutions. We are not a super board of education. We haven't been elected or appointed as a superintendent or the

board of education of any school, the president of any college, the governor of any state, or the warden of any prison. And we have only the right, in my opinion, to intervene when there is a clear and convincing showing that some right guaranteed by the Constitution of the United States has been violated. That is my general philosophy in all of these cases.

Let us apply these considerations to cases regarding schools. The importance of the education of the young cannot be overemphasized. Every philosopher of government, from Plato on down, has emphasized the importance of educating the young to preserve the country for future generations and has recognized the young as a natural resource, if you want to call it that, that has to be developed. There is nothing new about that.

What makes our society unique in history is that as far as I know we have been the only one that undertakes to try to educate just about everyone who is capable of receiving an education. In the past, while the importance of education has been recognized, education has been confined to an elite ruling class. Most of the philosophers that I spoke of devised in their theories a system whereby an elite ruling class would be educated. Our system, however, while recognizing the undoubted importance of education, requires that everyone who is capable of absorbing an education report to school and try to have one administered to them, and has established an elaborate school system for that purpose. And this is rightfully so in the light of our democratic traditions.

In our system, if democracy is to work, we must educate all, because people in order to make intelligent decisions with regard to electing their public officials, have to have some education; in our society the average citizen has to be able to evaluate what these officials do, try to make some evaluation of economics and even international relations; they have to know history and language. There can be no communication with the citizens if they can't understand and read the English language. Therefore, we have a system of compulsory education.

To some extent, this is a restraint of liberty, but that is an aspect that should not be overemphasized, in my opinion. Many of the cases and authorities I have read in connection with this case seemed to look at education more as an adversary situation, where the student is a kind of prisoner of the school.[1] The approach of these articles is then, that the student should have an array of rights as prisoners or criminal suspects do. I think this approach has gone too far. I don't agree with many of those articles.

As I see it, just because the government is involved in education, there is no reason—as has been argued here—that the full rigor of those portions of the Constitution applicable to criminal proceedings should be employed in trying to preserve discipline in a public school.

Now I want to make clear throughout these remarks that I am not talking about a case where a criminal prosecution is a likely result of whatever investigation or proceeding is going on. Almost all of the cases that were cited to me and which we discovered involve searches for drugs.[2] And many of them disapprove searches in schools when the school authorities were looking for drugs and where the police were standing by to arrest students who were found with them. I think that presents a different situation. A technical argument can be made for applying the full rigors of the criminal law amendments to the Constitution to ordinary disciplinary situations in schools, but I do not think that such an application would be in accord with common sense.

---

1. *See, e.g.,* Buss, *The Fourth Amendment and Searches of Students in Public Schools,* 59 Iowa L.Rev. 739, 770, 772–73 (1974); W. LaFave, *Search & Seizure* § 10.11. *Cf.* Note, *Due Process, Due Politics, and Due Respect: Three Models of Legitimate School Governance,* 94 Harv.L.Rev. 1106 (1981).

2. *See* note 7, *infra.*

A young lawyer said to me recently, "Judge, don't let your common sense get in the way of your interpretations of constitutional law." He was joking, but I certainly disagree with his statement. In my view, those men who wrote our Constitution were among the wisest who ever lived, a remarkable group of men, if you study your history. In my opinion, they devised the best form of government ever yet devised. In my personal opinion, they were guided by a higher power in doing so. But you will never convince me that these men were not men of common sense, or that they intended the Constitution that they wrote to be applied in a manner not in accord with common sense.

Now let's take a look at the application of the Constitution to the schools in general and to this case in particular, in the light of common sense. Again, I want to emphasize that I am not talking about cases where the authorities are trying to catch some student in some criminal activity so he can be prosecuted, but about cases where, as here, we are trying to preserve discipline in the schools.

There is no doubt that a student does not leave, as one case says, his constitutional rights at the schoolhouse gate when he enters a public school.[3] Thus, he obviously could not be made to sign a petition for a political candidate or be suspended, or to sign a petition in support of a tax levy as a condition of attendance. As various cases have held, he can't be made to say a prayer[4] or salute the flag.[5] He can wear a black arm band, if it doesn't cause a disturbance, as a form of political expression, as one case has held.[6] He has those rights. And he has a right to privacy as well, as I will discuss in a minute. But as I had occasion to say in another case that came in

here about a year ago, there is no constitutional right to be free of discipline, even strict discipline, when you are a part of an institution where discipline is appropriate.

As I said at that time:

"Essential to the functioning of a family, or the school as a substitute for the family, is discipline. The traditions of our culture recognize that due discipline in the rearing of the young is necessary and wholesome, rather than a violation of personal rights. It has been said:

'... what son is there whom his father does not discipline? If you are left without discipline, in which all have participated, then you are illegitimate children and not sons ... For the moment all discipline seems painful rather than pleasant; later it yields the peaceful fruit of righteousness to those who have been trained by it.' "[7]

I think common sense and knowledge of human nature require the conclusion that discipline is an essential and beneficial part of human life. I have no doubt that those wise men who wrote our Constitution recognized that fact. Discipline is important to the success of many human enterprises, whether putting on a play, maintaining an army, managing a business, or fielding a winning team. What team is most successful? The one with the least discipline or the one with a high degree of constructive discipline? Even this court could not operate if we didn't have discipline. We can't allow people to come in here and set off firecrackers or even speak when they feel like speaking. They have to observe certain rules. They have to observe the Rules of Evidence and the rules of decorum, which are a form of discipline. The court could not function otherwise. And especially, I think, is discipline necessary in the school.

---

3. *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

4. *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

5. *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

6. *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

7. *Petrey v. Flaugher*, 505 F.Supp. 1087, 1091 (E.D.Ky.1981), quoting Hebrews 12:5–11 (Revised Standard version).

I can't think of any type of human endeavor, other than perhaps the armed forces, where discipline would be more necessary than in a high school.

Common sense requires that the Constitution must be interpreted in the light of certain facts, which are inherent in the human condition. In interpreting the Constitution, I think we have to be guided by the following principles that are dictated by common sense.

The first of these principles is that the purpose of schools is to teach. The second is that an atmosphere of calm and order is required if kids are going to learn. This is well stated in the Code of Conduct in the Kenton County Schools. The third principle dictated by common sense is that kids are immature. That's why they are kids and not adults. That's why we have the compulsory school system and why that system has to have rules. The fourth principle is that kids, because they are immature, don't like the atmosphere of calm and order required for learning. They like turmoil and excitement.

This is especially true at this time of the year, when it is spring and the weather is nice and school is about to get out. Kids get a little restless. As I said, kids are immature. They don't see that it is to their benefit today to learn something they can use tomorrow.

And I think the following consideration is also dictated by common sense and practical experience. If you have 95 calm, orderly kids who are willing to learn something, and you have 5 kids who want to entertain themselves by causing a disturbance, you better do something about the 5 kids and do it quickly or you are going to have 100 kids who are causing a disturbance and nothing is going to be learned that day.

I think, in light of these considerations, it stands to reason that if a few kids are setting off firecrackers, throwing paper-wads, squirting squirt-guns, setting off stink-bombs and all the other things that kids would like to do in school rather than learn their lessons, the teachers, in order to do their jobs, accomplish the goals of the institution, and do what the taxpayers expect them to do, have to impose some swift, firm discipline. I don't think they can stop to obtain a warrant, go down to the courthouse before a neutral and detached magistrate, or consult a lawyer as to whether exigent circumstances exist in that kind of situation—that is, a situation that involves a petty disciplinary problem that just has to be corrected and be dealt with so the school can get on with the business of the day.

The teachers have to find out who has the firecrackers, the squirt-guns, the bean-shooters, the sling-shots, the stink-bombs, confiscate them quickly, impose some kind of appropriate punishment and get the situation under control before they have a major confrontation on their hands, and get on with trying to teach the kids something that day so the taxpayers can get their money's worth out of what they established the school for. If the teachers have to have a federal case made out of every petty disciplinary incident, the whole purpose of having any discipline at all and any rules of conduct would be defeated.

I hold that where ordinary disciplinary actions are concerned, as distinguished from criminal activity, the Constitution does not require otherwise. If you will permit a personal observation, in my opinion, if there is a problem with discipline in the schools today, it is that there is too little discipline, not too much discipline.

Does this mean that children in school have no constitutional rights? Of course not. They have a right to privacy, interpreted in the light of common sense considering the fact that they are there to learn something and they have to be controlled if they are going to do it. I think the rule of reason is the lodestar by which the Constitution ought to be interpreted in defining the right of privacy under these circumstances.[8] For instance, the teachers

8. This court adopts the reasoning of *State in the Interest of T.L.O.*, 178 N.J.Super. 329, 428 A.2d 1327, 1333 (1980) in this regard.

in this case would not, I think, have been justified in having a strip search to find these firecrackers, having the whole class report to the boys' room or the girls' room and have everybody strip down. In a couple of cases that were cited to me, that was actually done, although they were looking for drugs in those cases.[9] I don't think those cases are applicable here. The teachers here didn't do that. And I think the student's constitutional right of privacy would have prevented them from doing it. But I do think that they have the right to require that pockets and purses be opened when there are firecrackers going off all over the place and the situation is getting out of hand. Something has to be done so that they can accomplish the purpose of the institution for that particular day.

Again, I want to emphasize I am saying nothing with regard to how searches, with criminal proceedings in mind, should be governed. That is not before me. I don't say anything about it. I don't know how I would rule under such circumstances. Nor am I saying anything about maintaining discipline on college campuses. We are talking here about a high school. Also, I want to make it clear that I am saying nothing about periodic general searches; that is, going into everybody's locker with a general search or frisking everybody in a general search for contraband. That isn't the case here, either. Here we had an immediate disturbance going on that the teachers had to do something about before it got out of hand.

Therefore, my conclusions of law in this case are as follows:

1. The plaintiff's argument concerning the suspension; that is, that it was based on refusal to abandon her constitutional right does not present a genuine issue. I think that this young lady could have turned her purse over under protest and preserved her rights or preserved them in some other manner. I regard the true issue to be: was the request to search the purse justified in this instance. I hold that it was justified because of the disturbance that was going on right there at that time which had to be stopped, which the teachers had to get under control if any learning was going to take place in that school for the rest of that day.

2. I hold that if a search would have been justified, then a request to hand over or open her purse was justified. Plaintiff argues that, although the teachers might have been justified in seizing and searching the purse, they were not justified in suspending plaintiff for refusing to open it or hand it over. I do not believe the teachers were required to resort to physical force in this situation. If a search of the purse was justified, a request to open it or surrender it was justified.

3. By whatever test you use, the search was justified. Since several students had said that plaintiff was the one who had the firecrackers, there was reasonable suspicion and even probable cause to search her purse.[10] But I hold that reasonableness under the circumstances is the criterion [11] and that this request to search was reasonable because of the need for prompt firm discipline and the other considerations discussed

---

9. *Doe v. Renfrow,* 475 F.Supp. 1012 (N.D.Ind. 1979), aff'd. 631 F.2d 91 (7th Cir.1980); *Bellnier v. Lund,* 438 F.Supp. 47 (N.D.N.Y.1977). *See also M.M. v. Anker,* 607 F.2d 588 (2d Cir. 1979).

10. Some courts apply a "reasonable suspicion" test for searches in schools. *State in the Interest of T.L.O.,* 178 N.J.Super. 329, 428 A.2d 1327 (1980) is an excellently reasoned opinion following this approach. Others use a full blown probable cause test. Again, these cases usually concern searches for drugs. *See* W. LaFave, *Search and Seizure,* § 10.11.

11. *Cf. Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Although *Camara* holds that the Fourth Amendment is applicable to governmental administrative searches, there is a division of authority as to whether searches by public school officials are private searches for Fourth Amendment purposes. See Annotation 49 A.L.R.3d 978; W. LaFave, *Search and Seizure* § 1.6. An alternative approach might be to consider a situation such as that presented in the case at bar as a privacy problem under the Ninth Amendment. This court believes that the reasonableness criterion would still apply, however.

above. Therefore, I hold that the plaintiff refused a lawful request of the administration, which, under the statute [12] and the disciplinary code, is a disciplinary infraction.

4. I further hold that a suspension of five days was not an inappropriate remedy, considering all of the trouble and turmoil that had been caused on that day by this young lady. It is a serious punishment but it isn't a devastating punishment, and bears a rational relationship to the severity of the offense.[13]

5. As an additional ground, I hold that thereafter she freely admitted she had the firecrackers that were causing the disturbance and, therefore, waived any rights that she might have had, and that a concurrent ground for the suspension was possession of the firecrackers to which the plaintiff ultimately admitted in the hope of mitigating her punishment.

6. At oral argument plaintiff abandoned any procedural due process issue.

As a personal observation, in my opinion, this case should never have gone to court. I think the parents, when the young lady went home, would have been better advised to take her back to school, find out what happened, advise her to apologize, and see if the officials might change their mind about the suspension if she was going to miss any important work.

I am personally distressed by the cases that come into this court where there are confrontations among people who ought to be working together for common goals, whether they are teachers and school superintendents, professors and colleges, or students and educators, and particularly, parents and the school in this instance. I think the teachers were fully justified in this instance, and if the parents would have worked with them, the situation could have been resolved without having to come into federal court with it, disrupt the whole school, and get a lot of bad publicity for everybody. That is just a personal observation. Anybody has a legal right to come to court if they want to come, and a substantial enough technical constitutional question was raised that we have jurisdiction.

Although the court does not adopt the doctrine of *in loco parentis* across the board, as has been suggested, my own philosophy is that most parents send their children to school to learn something, and they know they are going to have to have some discipline if they are going to learn something. I know my parents sent me someplace where they hoped I would have some discipline. I sent my children someplace where I hoped they would have some discipline. I think teachers and administrators have a tough time trying to fulfill the responsibility that is delegated to them by the parents. I think teachers and administrators are essential to our society and civilization, and the fact that they have some disciplinary authority is absolutely essential to their getting the job done. If it hadn't been for the teachers who imposed discipline on me that I didn't like at the time, I don't think I would be sitting up here right now. I am the first to admit it.

This court is committed to supporting the family, and supporting the schools and the teachers to whom the family has delegated part of its responsibility to raise the next generation. This court is determined to support them unless, as I said, there is some clear violation of a federal constitutional right involved in which case, then, this court has an equally clear duty to intervene. We have and will intervene when appropriate.

In the light of these conclusions, the order of the court will be that the claim by the plaintiff is unfounded, that the complaint will be dismissed with prejudice. The defendants will recover their costs. A separate judgment will enter to that effect.

IT IS ORDERED that the above transcription of the oral opinion delivered by the court on Monday, May 10, 1982, be, and it is, hereby adopted as the findings of fact and conclusions of law by the court.

---

**12.** KRS 158.150.

**13.** *See* discussion in *Petry v. Flaugher*, 505 F.Supp. 1087, 1091 (E.D.Ky.1981).

**490**

APPENDIX

STIPULATION

Come now the parties to the above-captioned action, by their respective counsel, agreeing on many of the facts relevant to this action, and enter into the following stipulation of facts:

1. On May 4, 1982, plaintiff Sheila Bahr took a box of "party poppers" (a small firework) to school. Sheila Bahr gave some of the poppers to her friends. In her fifth period class, three of the poppers were thrown and exploded during class, disrupting the class, and the teacher sent some of the students, not Sheila Bahr, to the Dean's Office. Students had seen Sheila Bahr place poppers in her purse and reported this fact to the Dean of Boys.

2. During Sheila Bahr's sixth period class, after the fifth period incident and in a different schoolroom, plaintiff was called to the Office of the Dean of Girls. There was no disruption of the sixth period class. Sheila Bahr left her purse in the classroom when she went to the Dean's Office.

3. Defendant Beardon, Dean of Girls, asked to look into plaintiff's purse. Plaintiff refused to allow any search of her purse.

4. Defendant Beardon told plaintiff she was going to plaintiff's sixth period classroom to get plaintiff's purse and search it. Defendant followed plaintiff to the classroom, plaintiff retrieved her purse, and again refused to allow the purse to be searched.

5. Upon returning to the Dean's Office, defendant Beardon consulted with defendant Jenkens, the school's principal. Defendant Jenkens requested to search plaintiff's purse—plaintiff again refused to consent to such a search.

6. Defendant Jenkens informed plaintiff that she would be suspended from school for five days for refusing to allow the purse to be searched. Defendant Jenkens also informed plaintiff that her punishment would be less severe if she allowed the search, even if party poppers were found in the purse.

7. Defendant Beardon called plaintiff Nancy Bahr and informed her of the situation. Defendant Beardon informed Nancy Bahr that Sheila Bahr would be suspended for five days for refusal to allow her purse to be searched while her punishment would be less severe if the search was allowed. Nancy Bahr supported her daughter's refusal to consent to the search of her purse.

8. Plaintiff was suspended from school for five days for refusal to allow her purse to be searched. Plaintiff's suspension was related to use of the party poppers. After being informed of her suspension, plaintiff turned over one party popper and an empty box which would hold 25 poppers which she stated came from her purse.

9. Plaintiff will not be allowed to make up any school work, assignments, or tests missed during the period of her suspension.

10. Sheila Bahr had been at Dixie High School since April 5, 1982, having transferred from St. Henry's.

11. Plaintiff was furnished a copy of the Student Code of Conduct attached hereto and both plaintiffs acknowledged receipt of same.

**DIXIE HEIGHTS HIGH SCHOOL**
3010 Dixie Highway
FORT MITCHELL, KY. 41017

JAMES JENKINS
Principal

VIRGINIA BEARDEN
Dean of Girls

ELIZABETH D. MANN
Guidance Counselor

DAVID AFTERKIRK
Asst. Principal

GARRY PAUL
Dean of Boys

VIRGINIA M. HELD
Guidance Counselor

May 4, 1982

Mr. & Mrs. Thomas Bahr
1028 Rose Circle
Park Hills, Kentucky 41011

Dear Mr. & Mrs. Bahr:

As stated in the Kenton County Board of Education Policy Manual—"a search of a student's person will be conducted only if there is reasonable cause to believe that a breach of conduct rules is being committed by the student." In this case, we were notified that Sheila Bahr had "party poppers" in her possession. When asked several times to search her purse, she refused.

Sheila has, therefore, been suspended from Dixie Heights High School for five days effective May 5, 6, 7, 10, 11, 1982, for defiance of authority. This is cited in the Student Code of Conduct Rules, page nine, as refusal to comply with a reasonable request of school personnel.

Sincerely,

Jim Jenkins
Principal

Gina Bearden
Dean of Girls

JJ: GB: pas
cc: Norb Lewin, Director of Pupil Personnel
    Jim Jenkins, Principal
    Dave Afterkirk, Assistant Principal