Justice Thomas,
dissenting.
The Court’s decision today does not comport with the original public understanding of the First Amendment. The majority strikes down, as facially unconstitutional, a state law that prohibits the direct sale or rental of certain video games to minors because the law “abridges] the freedom of speech.” U. S. Const., Arndt. 1. But I do not think the First Amendment stretches that far. The practices and beliefs of the founding generation establish that “the freedom of speech,” as originally understood, does not include a right to speak to minors (or a right of minors to access speech) without going through the minors’ parents or guardians. I would hold that the law at issue is not facially unconstitutional under the First Amendment, and reverse and remand for further proceedings.[1]
*822 I
When interpreting a constitutional provision, “the goal is to discern the most likely public understanding of [that] provision at the time it was adopted.” McDonald v. Chicago, 561 U. S. 742, 828 (2010) (Thomas, J., concurring in part and concurring in judgment). Because the Constitution is a written instrument, “its meaning does not alter.” McIntyre v. Ohio Elections Comm'n, 514 U. S. 334, 359 (1995) (Thomas, J., concurring in judgment) (internal quotation marks omitted). “That which it meant when adopted, it means now.” Ibid, (internal quotation marks omitted).
As originally understood, the First Amendment’s protection against laws “abridging the freedom of speech” did not extend to all speech. “There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.” Chaplinsky v. New Hampshire, 315 U. S. 568, 571-572 (1942); see also United States v. Stevens, 559 U. S. 460, 468-469 (2010). Laws regulating such speech do not “abridg[e] the freedom of speech” because such speech is understood to fall outside “the freedom of speech.” See Ashcroft v. Free Speech Coalition, 535 U. S. 234, 245-246 (2002).
In my view, the “practices and beliefs held by the Founders” reveal another category of excluded speech: speech to minor children bypassing their parents. McIntyre, supra, at 360. The historical evidence shows that the founding generation believed parents had absolute authority over their minor children and expected parents to use that authority to direct the proper development of their children. It would be absurd to suggest that such a society understood “the freedom of speech” to include a right to speak to minors (or a corresponding right of minors to access speech) without going through the minors’ parents. Cf. Brief for Common Sense Media as Amicus Curiae 12-15. The founding generation would not have considered it an abridgment of “the *823 freedom of speech” to support parental authority by restricting speech that bypasses minors’ parents.
A
Attitudes toward children were in a state of transition around the time that the States ratified the Bill of Rights. A complete understanding of the founding generation’s views on children and the parent-child relationship must therefore begin roughly a century earlier, in colonial New England.
In the Puritan tradition common in the New England Colonies, fathers ruled families with absolute authority. “The patriarchal family was the basic building block of Puritan society.” S. Mintz, Huck’s Raft 13 (2004) (hereinafter Mintz); see also R. MacDonald, Literature for Children in England and America From 1646 to 1774, p. 7 (1982) (hereinafter MacDonald). The Puritans rejected many customs, such as godparenthood, that they considered inconsistent with the patriarchal structure. Mintz 13.
Part of the father’s absolute power was the right and duty “to fill his children’s minds with knowledge and . . . make them apply their knowledge in right action.” E. Morgan, The Puritan Family 97 (rev. ed. 1966) (hereinafter Morgan). Puritans thought children were “innately sinful and that parents’ primary task was to suppress their children’s natural depravity.” S. Mintz & S. Kellogg, Domestic Revolutions 2 (1988) (hereinafter Mintz & Kellogg); see also B. Wadsworth, The Well-Ordered Family 55 (1712) (“Children should not be left to themselves ... to do as they please;. . . not being fit to govern themselves”); C. Mather, A Family Well-Ordered 38 (1699). Accordingly, parents were not to let their children read “vain Books, profane Ballads, and filthy Songs” or “fond and amorous Romances, . . . fabulous Histories of Giants, the bombast Achievements of Knight Errantry, and the like.” The History of Genesis, pp. vi-vii (3d ed. corrected 1708).
*824 This conception of parental authority was reflected in laws at that time. In the Massachusetts Colony, for example, it was unlawful for tavern keepers (or anyone else) to entertain children without their parents’ consent. 2 Records and Files of the Quarterly Courts of Essex County, Massachusetts, p. 180 (1912); 4 id., at 237, 275 (1914); 5 id., at 143 (1916); see also Morgan 146. And a “stubborn or REBELLIOUS SON” of 16 years or more committed a capital offense if he disobeyed “the voice of his Father, or the voice of his Mother.” The Laws and Liberties of Massachusetts 6 (1648) (reprint M. Farrand ed. 1929); see also J. Kamensky, Governing the Tongue 102, n. 14 (1997) (citing similar laws in the Connecticut, New Haven, Plymouth, and New Hampshire Colonies in the late 1600’s).
B
In the decades leading up to and following the Revolution, attitudes toward children changed. See, e.g., J. Reinier, From Virtue to Character: American Childhood, 1775-1850, p. 1 (1996) (hereinafter Reinier). Children came to be seen less as innately sinful and more as blank slates requiring careful and deliberate development. But the same overarching principles remained. Parents continued to have both the right and duty to ensure the proper development of their children. They exercised significant authority over their children, including control over the books that children read. And laws at the time continued to reflect strong support for parental authority and the sense that children were not fit to govern themselves.
1
The works of John Locke and Jean-Jacques Rousseau were a driving force behind the changed understanding of children and childhood. See id., at 2-5; H. Brewer, By Birth or Consent 97 (2005) (hereinafter Brewer); K. Calvert, Children in *825 the House 59-60 (1992) (hereinafter Calvert). Locke taught that children’s minds were blank slates and that parents therefore had to be careful and deliberate about what their children were told and observed. Parents had only themselves to blame if, “by humouring and cockering” their children, they “poison’d the fountain” and later “taste[d] the bitter waters.” Some Thoughts Concerning Education (1692), in 37 English Philosophers of the Seventeenth and Eighteenth Centuries 27-28 (C. Eliot ed. 1910). All vices, he explained, were sowed by parents and “those about children.” Id., at 29. Significantly, Locke did not suggest circumscribing parental authority but rather articulated a new basis for it. Rousseau disagreed with Locke in important respects, but his philosophy was similarly premised on parental control over a child’s development. Although Rousseau advocated that children should be allowed to develop naturally, he instructed that the environment be directed by “a tutor who is given total control over the child and who removes him from society, from all competing sources of authority and influence.” J. Fliegelman, Prodigals and Pilgrims 30 (1982) (hereinafter Fliegelman); see also Reinier 15.
These writings received considerable attention in America. Locke’s An Essay Concerning Human Understanding and his Some Thoughts Concerning Education were significantly more popular than his Two Treatises of Government, according to a study of 92 colonial libraries between 1700 and 1776. Lundberg & May, The Enlightened Reader in America, 28 American Quarterly 262, 273 (1976) (hereinafter Lundberg). And Rousseau’s Emile, a treatise on education, was more widely advertised and distributed than his political work, The Social Contract. Fliegelman 29; see also Lundberg 285. In general, the most popular books in the Colonies on the eve of the American Revolution were not political discourses but ones concerned with child rearing. See Mintz & Kellogg 45.
*826 2
Locke’s and Rousseau’s writings fostered a new conception of childhood. Children were increasingly viewed as malleable creatures, and childhood came to be seen as an important period of growth, development, and preparation for adulthood. See id., at 17, 21, 47; M. Grossberg, Governing the Hearth 8 (1985) (hereinafter Grossberg). Noah Webster, called the father of American education, wrote that “[t]he impressions received in early life usually form the characters of individuals.” On the Education of Youth in America (1790) (hereinafter Webster), in Essays on Education in the Early Republic 43 (F. Rudolph ed. 1965) (hereinafter Rudolph); cf. Slater, Noah Webster: Founding Father of American Scholarship and Education, in Noah Webster’s First Edition of an American Dictionary of the English Language (1967). Elizabeth Smith, sister-in-law to John Adams, similarly wrote: “The Infant Mind, I beleive[,] is a blank, that eassily receives any impression.” M. Norton, Liberty’s Daughters 101 (1996) (hereinafter Norton) (internal quotation marks omitted; alteration in original); see also S. Doggett, A Discourse on Education (1796) (hereinafter Doggett), in Rudolph 151 (“[I]n early youth,... every power and capacity is pliable and susceptible of any direction or impression”); J. Abbott, The Mother at Home 2 (1834) (hereinafter Abbott) ('What impressions can be more strong, and more lasting, than those received upon the mind in the freshness and the susceptibility of youth”).
Children lacked reason and decisionmaking ability. They “have not Judgment or Will of their own,” John Adams noted. Letter to James Sullivan (May 26,1776), in 4 Papers of John Adams 210 (R. Taylor ed. 1979); see also Vol. 1 1787: Drafting the Constitution, p. 229 (W. Benton ed. 1986) (quoting Gouverneur Morris in James Madison’s notes from the Constitutional Convention explaining that children do not vote because they “want prudence” and “have no will of their own”). Children’s “utter incapacity” rendered them “almost *827 wholly at the mercy of their Parents or Instructors for a set of habits to regulate their whole conduct through life.” J. Burgh, Thoughts on Education 7 (1749) (hereinafter Burgh) (emphasis deleted).
This conception of childhood led to great concern about influences on children. ‘Touth are ever learning to do what they see others around them doing, and these imitations grow into habits.” Doggett, in Rudolph 151; see also B. Rush, A Plan for the Establishment of Public Schools (1786) (hereinafter Rush), in Rudolph 16 (“The vices of young people are generally learned from each other”); Webster, in Rudolph 58 (“[C]hildren, artless and unsuspecting, resign their hearts to any person whose manners are agreeable and whose conduct is respectable”). Books therefore advised parents “not to put children in the way of those whom you dare not trust.” L. Child, The Mother’s Book 149 (1831) (hereinafter Child); see also S. Coontz, The Social Origins of Private Life 149-150 (1988) (noting that it was “considered dangerous to leave children to the supervision of servants or apprentices”).
As a result, it was widely accepted that children needed close monitoring and carefully planned development. See B. Wishy, The Child and the Republic 24-25, 32 (1968) (hereinafter Wishy); Grossberg 8. Managing the young mind was considered “infinitely important.” Doggett, in Rudolph 151; see also A. MacLeod, A Moral Tale 72-73 (1975) (hereinafter MacLeod). In an essay on the education of youth in America, Noah Webster described the human mind as “a rich field, which, without constant care, will ever be covered with a luxuriant growth of weeds.” Rudolph 54. He advocated sheltering children from “every low-bred, drunken, immoral character” and keeping their minds “untainted till their reasoning faculties have acquired strength and the good principles which may be planted in their minds have taken deep root.” Id., at 63; see also Rush, in id., at 16 (“[T]he most useful citizens have been formed from those youth who have *828 never known or felt their own wills till they were one and twenty years of age”); Burgh 7 (“[T]he souls of Youth are more immediately committed to the care of their Parents and Instructors than even those of a People are to their Pastor”).
The Revolution only amplified these concerns. The Republic would require virtuous citizens, which necessitated proper training from childhood. See Mintz 54, 71; MacLeod 40; Saxton, French and American Childhoods, in Children and Youth in a New Nation 69 (J. Marten ed. 2009) (hereinafter Marten); see also W. Cardell, Story of Jack Halyard, pp. xv-xvi (30th ed. 1834) (hereinafter Cardell) (“[T]he glory and efficacy of our institutions will soon rest with those who are growing up to succede us”). Children were “the pivot of the moral world,” and their proper development was “a subject of as high interest, as any to which the human mind ha[d] ever been called.” Id., at xvi.
3
Based on these views of childhood, the founding generation understood parents to have a right and duty to govern their children’s growth. Parents were expected to direct the development and education of their children and ensure that bad habits did not take root. See Calvert 58-59; MacLeod 72; Mintz & Kellogg 23. They were responsible for instilling “moral prohibitions, behavioral standards, and a capacity for self-government that would prepare a child for the outside world.” Mintz & Kellogg 58; see also Youth’s Companion, Apr. 16, 1827, p. 1 (hereinafter Youth’s Companion) (“Let [children’s] minds be formed, their hearts prepared, and their characters moulded for the scenes and the duties of a brighter day”). In short, “[h]ome and family bore the major responsibility for the moral training of children and thus, by implication, for the moral health of the nation.” MacLeod 29; see also Introduction, in Marten 6; Reinier, p. xi; Smith, Autonomy and Affection: Parents and Children *829 in Eighteenth-Century Chesapeake Families, in Growing up in America 54 (N. Hiner & J. Hawes eds. 1985).
This conception of parental rights and duties was exemplified by Thomas Jefferson’s approach to raising children. He wrote letters to his daughters 'constantly and often gave specific instructions about what the children should do. See, e. g., Letter to Martha Jefferson (Nov. 28, 1783), in S. Randolph, The Domestic Life of Thomas Jefferson 44 (1939) (dictating her daily schedule of music, dancing, drawing, and studying); Letter to Martha Jefferson (Dec. 22, 1783), in id., at 45-46 (“I do not wish you to be gaily clothed at this time of life .... [AJbove all things and at all times let your clothes be neat, whole, and properly put on”). Jefferson expected his daughter, Martha, to write “by every post” and instructed her, “Inform me what books you read [and] what tunes you learn.” Letter (Nov. 28, 1783), in id., at 44. He took the same approach with his nephew, Peter Carr, after Carr’s father died. See Letter (Aug. 19, 1785), in 8 The Papers of Thomas Jefferson 405-408 (J. Boyd ed. 1953) (detailing a course of reading and exercise, and asking for monthly progress reports describing “in what manner you employ every hour in the day”); see also 3 Dictionary of Virginia Biography 29 (2006).
Jefferson’s rigorous management of his charges was not uncommon. “[M]uch evidence indicates that mothers and fathers both believed in giving their children a strict upbringing, enforcing obedience to their commands and stressing continued subjection to the parental will.” Norton 96. Two parenting books published in the 1830’s gave prototypical advice. In The Mother’s Book, Lydia Child advised that “[t]he first and most important step in management is, that whatever a mother says, always must be done.” Child 26. John Abbott, the author of The Mother at Home, likewise advised that “[o]bedience is absolutely essential to proper family government.” Abbott 18. Echoing Locke, Abbott warned that parents who indulged a child’s “foolish and un *830 reasonable wishes” would doom that child to be indulgent in adulthood. Id., at 16.
The concept of total parental control over children’s lives extended into the schools. “The government both of families and schools should be absolute,” declared Noah Webster. Rudolph 57-58. Dr. Benjamin Rush concurred: “In the education of youth, let the authority of our masters be as absolute as possible.” Id., at 16. Through the doctrine of in loco parentis, teachers assumed the “ ‘sacred dut[y] of parents ... to train up and qualify their children’ ” and exercised the same authority “ ‘to command obedience, to control stubbornness, to quicken diligence, and to reform bad habits.’ ” Morse v. Frederick, 551 U. S. 393, 413-414 (2007) (Thomas, J., concurring) (quoting State v. Pendergrass, 19 N. C. 365, 365-366 (1837)); see also Wishy 73. Thus, the quality of teachers and schools had to “be watched with the most scrupulous attention.” Webster, in Rudolph 64.
For their part, children were expected to be dutiful and obedient. Mintz & Kellogg 53; Wishy 31; cf. J. Kett, Rites of Passage 45 (1977). Schoolbooks instructed children to do so and frequently featured vignettes illustrating the consequences of disobedience. See Adams, “Pictures of the Vicious ultimately overcome by misery and shame”: The Cultural Work of Early National Schoolbooks (hereinafter Adams), in Marten 156. One of trelated example was the hangings of 19 alleged witches in 1692, which, the schoolbooks noted, likely began with false complaints by two young girls. See J. Morse, The American Geography 191 (1789); see also Adams, in Marten 164.
An entire genre of books, “loosely termed ‘advice to youth,’” taught similar lessons well into the 1800’s. J. Demos, Circles and Lines: The Shape of Life in Early America 73 (2004); cf. Wishy 54. “Next to your duty to God,” advised one book, “is your duty to your parents,” even if the child did not “understand the reason of their commands.” L. Sigourney, The Girl’s Reading Book 44 (14th ed. *831 1843); see also Filial Duty Recommended and Enforced, Introduction, p. iii (c. 1798); The Parent’s Present 44 (3d ed. 1841). “Disobedience is generally punished in some way or other,” warned another, “and often very severely.” S. Goodrich, Peter Parley’s Book of Fables 43 (1836); see also The Country School-House 27 (1848) (“[T]he number of children who die from the effects of disobedience to their parents is very large”).
4
Society’s concern with children’s development extended to the books they read. “Vice always spreads by being published,” Noah Webster observed. Rudolph 62. “[Y]oung people are taught many vices by fiction, books, or public exhibitions, vices which they never would have known had they never read such books or attended such public places.” Ibid.; see also Cardell, p. xii (cautioning parents that “[t]he first reading lessons for children have an extensive influence on the acquisitions and habits of future years”); Youth’s Companion 1 (“[T]he capacities of children, and the peculiar situation and duties of youth, require select and appropriate reading”). Prominent children’s authors harshly criticized fairy tales and the use of anthropomorphic animals. See, e. g., S. Goodrich, 2 Recollections of a Lifetime 320, n.* (1856) (describing fairy tales as “calculated to familiarize the mind with things shocking and monstrous; to cultivate a taste for tales of bloodshed and violence; to teach the young to use coarse language, and cherish vulgar ideás;... and to fill [the youthful mind] with the horrors of a debased and debauched fancy”); 1 id., at 167 (recalling that children’s books were “full of nonsense” and “lies”); Cardell, p. xiv (“The fancy of converting inferior animals into Teachers of children,’ has been carried to ridiculous extravagance”); see also MacDonald 83, 103 (noting that fables and works of fantasy were not popular in America in the 1700’s).
Adults carefully controlled what they published for children. Stories written for children were dedicated to moral *832 instruction and were relatively austere, lacking details that might titillate children’s minds. See MacLeod 24-25, 42-48; see also id., at 42 (“The authors of juvenile fiction imposed the constraints upon themselves in the name of duty, and for the sake of giving to children what they thought children should have, although they were often well aware that children might prefer more exciting fare”); Francis, American Children’s Literature, 1646-1880, in American Childhood 208-209 (J. Hawes & N. Hiner eds. 1985). John Newbery, the publisher often credited with creating the genre of children’s literature, removed traditional folk characters, like Tom Thumb, from their original stories and placed them in new morality tales in which good children were rewarded and disobedient children punished. Reinier 12.
Parents had total authority over what their children read. See A. MacLeod, American Childhood 177 (1994) (“Ideally, if not always actually, nineteenth-century parents regulated their children’s lives fully, certainly including their reading”). Lydia Child put it bluntly in The Mother’s Book: “Children . . . should not read anything without a mother’s knowledge and sanction; this is particularly necessary between the ages of twelve and sixteen.” Child 92; see also id., at 143 (“[P]arents, or some guardian friends, should carefully examine every volume they put into the hands of young people”); E. Monaghan, Learning To Read and Write in Colonial America 337 (2005) (reviewing a 12-year-old girl’s journal from the early 1770’s and noting that the child’s aunts monitored and guided her reading).
5
The law at the time reflected the founding generation’s understanding of parent-child relations. According to Sir William Blackstone, parents were responsible for maintaining, protecting, and educating their children, and therefore had “power” over their children. 1 Commentaries on the Laws of England 434, 440-441 (1765); cf. Washington v. *833 Glucksberg, 521 U. S. 702, 712 (1997) (Blackstone’s Commentaries was “a primary legal authority for 18th- and 19th-century American lawyers”). Chancellor James Kent agreed. 2 Commentaries on American Law *189-*207. The law entitled parents to “the custody of their [children],” “the value of th[e] [children’s] labor and services,” and the “right to the exercise of such discipline as may be requisite for the discharge of their sacred trust.” Id., at *193, *203. Children, in turn, were charged with “obedience and assistance during their own minority, and gratitude and reverance during the rest of their lives.” Id., at *207.
Thus, in case after case, courts made clear that parents had a right to the child’s labor and services until the child reached majority. In 1810, the Supreme Judicial Court of Massachusetts explained, “There is no question but that a father, who is entitled to the services of his minor son, and for whom he is obliged to provide, may, at the common law, assign those services to others, for a consideration to enure to himself.” Day v. Everett, 7 Mass. 145, 147; see also Benson v. Remington, 2 Mass. 113, 115 (1806) (opinion of Parsons, C. J.) (“The law is very well settled, that parents are under obligations to support their children, and that they are entitled to their earnings”). Similarly, the Supreme Court of Judicature of New Hampshire noted that the right of parents to recover for the services of their child, while a minor, “cannot be contested.” Gale v. Parrot, 1 N. H. 28, 29 (1817). And parents could bring tort suits against those who knowingly enticed a minor away from them. See, e. g., Kirkpatrick v. Lockhart, 2 Brev. 276 (S. C. Constitutional Ct. 1809); Jones v. Tevis, 4 Litt. 25 (Ky. App. 1823).
Relatedly, boys could not enlist in the military without parental consent. Many of those who did so during the Revolutionary War found, afterwards, that their fathers were entitled to their military wages. See Cox, Boy Soldiers of the American Revolution, in Marten 21-24. And after the *834 war, minors who enlisted without parental consent in violation of federal law could find themselves returned home on writs of habeas corpus issued at their parents’ request. See, e. g., United States v. Anderson, 24 F. Cas. 813 (No. 14,449) (CC Tenn. 1812); Commonwealth v. Callan, 6 Binn. 255 (Pa. 1814) (per curiam).
Laws also set age limits restricting marriage without parental consent. For example, from 1730 until at least 1849, Pennsylvania law required parental consent for the marriage of anyone under the age of 21. See 4 Statutes at Large of Pennsylvania 153 (J. Mitchell & H. Flanders eds. 1897) (hereinafter Pa. Stats, at Large); General Laws of Pennsylvania 82-83 (J. Dunlop 2d ed. 1849) (including the 1730 marriage law with no amendments); see also Perpetual Laws of the Commonwealth of Massachusetts 253 (1788), in The First Laws of the Commonwealth of Massachusetts (J. Cushing ed. 1981), In general, “[p]ost-Revolutionary marriage law assumed that below a certain age, children could ... no[t] intellectually understand its significance.” Grossberg 105.
Indeed, the law imposed age limits on all manner of activities that required judgment and reason. Children could not vote, could not serve on juries, and generally could not be witnesses in criminal cases unless they were older than 14. See Brewer 43, 145, 148, 159. Nor could they swear loyalty to a State. See, e. g., 9 Pa. Stats, at Large 111 (1903 ed.). Early federal laws granting aliens the ability to become citizens provided that those under 21 were deemed citizens if their fathers chose to naturalize. See, e. g., Act of Mar. 26, 1790, 1 Stat. 104; Act of Jan. 29, 1795, ch. 20, 1 Stat. 415.
C
The history clearly shows a founding generation that believed parents to have complete authority over their minor children and expected parents to direct the development of those children. The Puritan tradition in New England laid the foundation of American parental authority and duty.
*835 See MacDonald 6 (“The Puritans are virtually the inventors of the family as we know it today”)- In the decades leading up to and following the Revolution, the conception of the child’s mind evolved but the duty and authority of parents remained. Indeed, society paid closer attention to potential influences on children than before. See Mintz 72 (“By weakening earlier forms of patriarchal authority, the Revolution enhanced the importance of childrearing and education in ensuring social stability”). Teachers and schools came under scrutiny, and children’s reading material was carefully supervised. Laws reflected these concerns and often supported parental authority with the coercive power of the state.
II
A
In light of this history, the Framers could not possibly have understood “the freedom of speech” to include an unqualified right to speak to minors. Specifically, I am sure that the founding generation would not have understood “the freedom of speech” to include a right to speak to children without going through their parents. As a consequence, I do not believe that laws limiting such speech — for example, by requiring parental consent to speak to a minor— “abridg[e] the freedom of speech” within the original meaning of the First Amendment.
We have recently noted that this Court does not have “freewheeling authority to declare new categories of speech outside the scope of the First Amendment.” Stevens, 559 U. S., at 472. But we also recognized that there may be “some categories of speech that have been historically unprotected [and] have not yet been specifically identified or discussed as such in our case law.” Ibid. In my opinion, the historical evidence here plainly reveals one such category.[2]
*836 B
Admittedly, the original public understanding of a constitutional provision does not always comport with modern sensibilities. See Morse, 551 U. S., at 419 (Thomas, J., concurring) (treating students “as though it were still the 19th century would find little support today”). It may also be inconsistent with precedent. See McDonald, 561 U. S., at 851-855 (Thomas, J., concurring in part and concurring in judgment) (rejecting the Slaughter-House Cases, 16 Wall. 36 (1873), as inconsistent with the original public meaning of the Privileges or Immunities Clause of the Fourteenth Amendment).
This, however, is not such a case. Although much has changed in this country since the Revolution, the notion that parents have authority over their children and that the law can support that authority persists today. For example, at least some States make it a crime to lure or entice a minor away from the minor’s parent. See, e. g., Cal. Penal Code Ann. § 272(b)(1) (West 2008); Fla. Stat. §787.03 (2010). Every State in the Union still establishes a minimum age for marriage without parental or judicial consent. Cf. Roper v. Simmons, 543 U. S. 551, 558 (2005) (Appendix D to opinion *837 of the Court). Individuals less than 18 years old cannot enlist in the military without parental consent. 10 U. S. C. § 505(a). And minors remain subject to curfew laws across the country, see Brief for State of Louisiana et al. as Amici Curiae 16, and cannot unilaterally consent to most medical procedures, id., at 15.
Moreover, there are many things minors today cannot do at all, whether they have parental consent or not. State laws set minimum ages for voting and jury duty. See Roper, supra, at 581-585 (Appendixes B and C to opinion of the Court). In California (the State at issue here), minors cannot drive for hire or drive a school bus, Cal. Veh. Code Ann. §§12515, 12516 (West 2010), purchase tobacco, Cal. Penal Code Ann. § 308(b) (West 2008), play bingo for money, § 326.5(e), or execute a will, Cal. Prob. Code Ann. §6220 (West 2009).
My understanding of “the freedom of speech” is also consistent with this Court’s precedents. To be sure, the Court has held that children are entitled to the protection of the First Amendment, see, e. g., Erznoznik v. Jacksonville, 422 U. S. 205, 212-213 (1975), and the government may not unilaterally dictate what children can say or hear, see id., at 213-214; Tinker v. Des Moines Independent Community School Dist., 393 U. S. 503, 511 (1969). But this Court has never held, until today, that “the freedom of speech” includes a right to speak to minors (or a right of minors to access speech) without going through the minors’ parents. To the contrary, “[i]t is well settled that a State or municipality can adopt more stringent controls on communicative materials available to youths than on those available to adults.” Erznoznik, supra, at 212; cf. post, at 841-842 (Breyer, J., dissenting).
The Court’s constitutional jurisprudence “historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children.”. Parham v. J. R., 442 U. S. 584, 602 (1979). Under that case law,
*838 The California law at issue here forbids the sale or rental of “violent video game[s]” to minors, defined as anyone “under 18 years of age.” Cal. Civ. Code Ann. §§ 1746.1(a), 1746 (West 2009). A violation of the law is punishable by a civil fine of up to $1,000. § 1746.3. Critically, the law does not prohibit adults from buying or renting violent video games for a minor or prohibit minors from playing such games. Cf. ante, at 814 (Alito, J., concurring in judgment); post, at 848 (Breyer, J., dissenting). The law also does not restrict a “minor’s parent, grandparent, aunt, uncle, or legal guardian” from selling or renting him a violent video game. § 1746.1(c).
Respondents, associations of companies in the video game industry, brought a preenforcement challenge to California’s law, claiming that on its face the law violates the free speech rights of their members. The Court holds that video games are speech for purposes of the First Amendment and finds “legislature^] [can] properly conclude that parents and others, teachers for example, who have ... primary responsibility for children’s well-being are entitled to the support of laws designed to aid discharge of that responsibility.” Ginsberg v. New York, 390 U. S. 629, 639 (1968); see also Bellotti v. Baird, 443 U. S. 622, 635 (1979) (opinion of Powell, J.) (“[T]he State is entitled to adjust its legal system to account for children’s vulnerability and their needs for concern, . . . sympathy, and . . . paternal attention” (internal quotation marks omitted)). This is because “the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter.” Id., at 638; id., at 638-639 (“Legal restrictions on minors, especially those supportive of the parental role, may be important to the child’s chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding”).
III *839 the statute facially unconstitutional. See ante, at 789-790, 799-804. I disagree.
Under any of this Court’s standards for a facial First Amendment challenge, this one must fail. The video game associations cannot show “that no set of circumstances exists under which [the law] would be valid,” “that the statute lacks any plainly legitimate sweep,” or that “a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep.” Stevens, 559 U. S., at 472, 473 (internal quotation marks omitted). Even assuming that video games are speech, in most applications the California law does not implicate the First Amendment. All that the law does is prohibit the direct sale or rental of a violent video game to a minor by someone other than the minor’s parent, grandparent, aunt, uncle, or legal guardian. Where a minor has a parent or guardian, as is usually true, the law does not prevent that minor from obtaining a violent video game with his parent’s or guardian’s help. In the typical ease, the only speech affected is speech that bypasses a minor’s parent or guardian. Because such speech does not fall within “the freedom of speech” as originally understood, California’s law does not ordinarily implicate the First Amendment and is not facially unconstitutional.[3]
* * *
“The freedom of speech,” as originally understood, does not include a right to speak to minors without going through the minors’ parents or guardians. Therefore, I cannot agree that the statute at issue is facially unconstitutional under the First Amendment.
I respectfully dissent.
*840 California’s statute defines a violent video game as: A game in which a player “kill[s], maim[s], dismember[s], or sexually assault[s] an image of a human being,” and
“[a] reasonable person, considering the game as a whole, would find [the game] appeals to a deviant or morbid interest of minors,”

and

“[the game] is patently offensive to prevailing standards in the community as to what is suitable for minors,”

and

“the game, as a whole, . . . lack[s] serious literary, artistic, political, or scientific value for minors.” Cal. Civ. Code Ann. § 1746(d)(1) (West 2009).
The statute in effect forbids the sale of such a game to minors unless they are accompanied by a parent; it requires the makers of the game to affix a label identifying it as a game suitable only for those aged 18 and over; it exempts retailers from liability unless such a label is properly affixed to the

 Justice Alito concludes that the law is too vague to satisfy due process, but neither the District Court nor the Court of Appeals addressed that question. Ante, at 806-813 (opinion concurring in judgment). As we have often said, this Court is “one of final review, ‘not of first view.’ ” FCC v. Fox Television Stations, Inc., 556 U. S. 502, 529 (2009) (quoting Cutter v. Wilkinson, 544 U. S. 709, 718, n. 7 (2005)).

 The majority responds that “it does not follow” from the historical evidence “that the state has the power to prevent children from hear *836 ing... anything without their parents’prior consent.” Ante, at 795, n. 3. Such a conclusion, the majority asserts, would lead to laws that, in its view, would be undesirable and “obviously” unconstitutional. Ibid.
The majority’s circular argument misses the point. The question is not whether certain laws might make sense to judges or legislators today, but rather what the public likely understood “the freedom of speech” to mean when the First Amendment was adopted. See District of Columbia v. Heller, 554 U. S. 570, 634-635 (2008). I believe it is clear that the founding public would not have understood “the freedom of speech” to include speech to minor children bypassing their parents. It follows that the First Amendment imposes no restriction on state regulation of such speech. To note that there may not be “precedent for [such] state control,” ante, at 795, n. 3, “is not to establish that [there] is a constitutional right,” McIntyre v. Ohio Elections Comm’n, 514 U. S. 334, 373 (1995) (Scalia, J., dissenting).

 Whether the statute would survive an as-applied challenge in the unusual case of an emancipated minor is a question for another day. To decide this ease, it is enough that the statute is not unconstitutional on its face.